**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles D. CAUDILL, Doffie Lynn
Fugate, and Gary Icenhouer,
Defendants–Appellants.**

Nos. 89–3522, 89–3564 and 89–3569.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1990.

Decided Oct. 4, 1990.

Rehearing Denied Nov. 26, 1990.

Before WOOD, Jr., EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendants–Appellants Charles D. Caudill, Doffie Lynn Fugate, and Gary Icenhouer were charged in a one-count indictment of conspiring to distribute 500 grams or less of cocaine in violation of 21 U.S.C. § 846.[1] A jury found the defendants guilty of the crime charged, and the district court sentenced Charles Caudill to twenty-one months imprisonment to be followed by three years supervised release. Doffie Lynn Fugate received a sentence of twenty-seven months imprisonment and three years supervised release, and Gary Icenhouer was sentenced to thirty-three months imprisonment and three years supervised release.

On appeal, defendants Charles Caudill and Doffie Lynn Fugate allege that there was insufficient evidence to support their convictions. Charles Caudill also contends that the trial court erred in denying his motion for severance. Defendant Gary Icenhouer argues that the district court abused its discretion when it admitted into evidence an inculpatory tape recording that the government failed to locate until after the trial had begun.

## I. FACTUAL BACKGROUND

The defendants were arrested on September 17, 1988, following their attempt to sell eight ounces of cocaine to Sean Sullivan, an informant for the Allen County, Indiana, Drug Task Force, and Arthur Barile, an officer for the Allen County Police Department who posed as Sullivan's partner. The evidence presented at trial revealed the following.

In September 1988, Delvin Caudill ("Delvin")[2] arrived at his sister's home in Wolcottville, Indiana. Allegedly because Delvin had only one arm, his cousin Charles drove him from Hazard, Kentucky, to Indiana. While in Wolcottville, Doffie Fugate, Delvin's nephew, asked Delvin if he could obtain some cocaine. Delvin told Fugate he could, but that he would have to make several phone calls. Fugate and a female friend informed Delvin that if Delvin could get the cocaine, Fugate could sell it quickly.

Delvin subsequently called Gary Icenhouer in Mountain City, Virginia. Delvin had known Icenhouer for about three years and had purchased marijuana from Icenhouer on past occasions. After Delvin told Icenhouer that he needed approximately ten ounces of cocaine, Icenhouer told him to travel to Mountain City to pick up the drug. Charles chauffeured Delvin down to Virginia for Delvin's rendevous with Icenhouer. Charles and Delvin met Icenhouer about a mile and a half outside of Mountain City. When Icenhouer drove up in his van, Delvin and Charles were standing at the back of Charles' pickup truck. Delvin got into the van with Icenhouer while Charles waited outside.

Icenhouer, who requested $12,000 for the ten ounces of cocaine, agreed to front the cocaine to Delvin. Delvin took the cocaine, which was enclosed in a long red box, back to the truck. Charles raised the seat of the truck so that Delvin could conceal the co-

---

[1]. Delvin Caudill ("Delvin"), Charles Caudill's cousin, was also charged in the indictment but pleaded guilty pursuant to a plea agreement and testified for the government at trial.

[2]. For purposes of clarity, we shall refer to Delvin Caudill as "Delvin" and Charles D. Caudill as "Charles." The remaining defendants and the various players in the drug transaction will be designated by their last names.

caine behind the seat. On the way back to Indiana, the two cousins allegedly stopped off in Clear Creek, Kentucky, to drop off two ounces of the cocaine.

While the cousins were in transit, Fugate and his female friend angled for a buyer. Fugate's friend approached Sean Sullivan, the informant, and asked him if he wished to buy nine ounces of cocaine. Sullivan stated that he wanted to negotiate directly with the person who had the cocaine, so Fugate's cohort arranged a meeting for Friday, September 16. Officers of the Allen County Drug Task Force outfitted Sullivan with a device to monitor and record his conversations.

Sullivan met Fugate in the parking lot of a bar on the evening of September 16. The pair sat in Fugate's car and quibbled over the price of the cocaine. Sullivan balked at Fugate's asking price of $1,500 an ounce. The two agreed to meet the following day to negotiate a mutually acceptable price. When Fugate and Sullivan met again, Sullivan agreed to pay $1,500 an ounce for the eight remaining ounces of cocaine. The drug exchange was set for later that evening in Kendallville, Indiana.

Sullivan showed up at the buy location with his "partner," Officer Barile. When Fugate arrived, he did not have the cocaine with him. Fugate explained that his partners were unwilling to give him the cocaine and instead wanted to exchange the drugs for the money at a residence where the cocaine was being stored. Sullivan eventually agreed to this arrangement, and he and Barile followed Fugate to a house where they met Delvin and Charles. Barile stayed in the car with the money. Sullivan and the three alleged conspirators had a general discussion about the quality of the cocaine and how Sullivan and Barile could enhance the potential profit by cutting the drug. Both Delvin and Sullivan testified that Charles was in the room when this discussion took place; Charles, Fugate, and Fugate's son testified that Charles was in

the garage playing with a toy remote-control car. After this short discussion, Charles [3] left the room and brought back a gallon thermos that contained a large plastic bag containing eight plastic bags of white powder. Sullivan tested the powder, found that it was relatively pure cocaine, and agreed to purchase it. The three cocaine entrepreneurs agreed to Sullivan's request that the actual exchange occur in a store parking lot in Kendallville.

Barile and Sullivan were waiting in the parking lot when Fugate, Charles, and Delvin arrived. Fugate was driving, Charles was in the front passenger seat, and Delvin was in the backseat. When Barile and Sullivan asked to see the cocaine, Charles took it out from under the car seat and showed it to Sullivan. Sullivan then gave a signal to surveillance officers, who promptly arrested Fugate, Charles, and Delvin. The seized package contained 214 grams of cocaine.

## II. Sufficiency of the Evidence

■ Charles and Fugate both allege that there was insufficient evidence to sustain their convictions. Neither defendant, however, moved for a judgment of acquittal at the close of the government's case or at the close of the evidence. A defendant who fails to file a timely motion for judgment of acquittal is deemed to have waived on appeal any challenge to the sufficiency of the evidence. See United States v. Berardi, 675 F.2d 894, 902 n. 16 (7th Cir.1982). When confronted with such an omission, an appellate court may reverse a conviction for insufficiency of the evidence only where the defendant demonstrates a manifest miscarriage of justice. Id.; United States v. Kilcullen, 546 F.2d 435, 441 (1st Cir.1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). As the following discussion reveals, the jury's verdict did not result in a manifest miscarriage of justice. Furthermore, there was suffi-

---

**3.** Government witnesses differed on who left the house to retrieve the cocaine. Sullivan testified that all three of the conspirators left to get the cocaine, while Delvin testified that only Charles

left the house. Significantly, both witnesses agreed that it was Charles who actually produced the cocaine-laden thermos.

cient evidence to support the jury's verdict even under the normal standard of review.

A verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury could find guilt beyond a reasonable doubt. *See United States v. Beverly*, 913 F.2d 337, 360 (7th Cir.1990); *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). In appeals of jury trials such as this case, we are obliged to " 'defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. Likewise, we leave the credibility of witnesses solely to the jury's evaluation, absent extraordinary circumstances.' " *Beverly*, at 360 (quoting *United States v. Hogan*, 886 F.2d 1497, 1502 (7th Cir.1989) (citation omitted)). To sustain the conspiracy charge against Charles and Fugate, the government need only prove the existence of the conspiracy and a participatory link with the defendants. *Durrive*, 902 F.2d at 1225; *United States v. Missick*, 875 F.2d 1294, 1297 (7th Cir.1989). Substantial evidence must support both the existence of the conspiracy and the defendants' participation in it. *Durrive*, 902 F.2d at 1229. Nonetheless, we "view the evidence in the light most favorable to the government and accept circumstantial evidence as support, even sole support, for a conviction." *Id.*

The evidence at trial easily established both the existence of the conspiracy and Charles' and Fugate's participation in it. *See United States v. Troop*, 890 F.2d 1393, 1397 (7th Cir.1989). Charles was present when Delvin obtained the cocaine from Icenhouer and helped to conceal it behind the seat in his truck. Charles conveyed Delvin to Virginia to pick up the drugs, drove him to Kentucky where Delvin dropped off two ounces of their contraband, and ferried Delvin back to Indiana where the final transaction was to occur. Delvin testified that Charles knew the purpose of their trip to Virginia, and that Charles retrieved the thermos filled with cocaine because Charles had secreted it in a garage. Delvin and Sullivan both testified that Charles was present at the meeting in the house. Furthermore, Sullivan testified that Charles displayed the cocaine and participated in the discussions concerning the financial gain that Sullivan and Barile could realize if they liberally cut the drug.

Charles maintains that although he was present at almost every stage of the transportation and sale of the drugs, he was merely an innocent bystander who sought only to charitably transport his one-armed cousin. Charles also alleges that his handling of the cocaine-filled thermos does not prove his knowledge of its contents. Finally, Charles relies on Fugate's testimony that Charles did not participate in the discussions with Sullivan concerning potential profit because Charles was occupied with a toy remote-control car outside the house. A jury could reasonably believe Delvin and Sullivan's testimony over that of Charles, Danny Fugate, and Doffie Fugate. We noted in *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989), that a conviction may rest solely on circumstantial evidence even when it is "totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant." The record does not suggest that either Sullivan or Delvin possess all of the disabilities imputed to the witness in *Molinaro*. We therefore find that a jury could properly conclude that Charles' participation in the cocaine conspiracy was crucial and extensive enough to warrant his conviction.

Doffie Fugate alleges that there was insufficient evidence of an agreement between him and the other conspirators to establish a conspiracy. Fugate compares himself to the defendant in *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985), who the Second Circuit found had merely "helped a willing buyer locate a willing seller." *Id.* at 69. As Dogberry noted, however, "Comparisons are odorous." W. Shakespeare, *Much Ado about Nothing*, act III, sc. 5, line 18. In *Tyler*, the government's evidence merely established that the defendant was approached by an undercover detective seeking drugs. The defendant simply volunteered to locate a willing seller among the many bystanders. Unlike this case, the government in *Tyler* did not present any evidence of an agreement be-

298

tween the defendant and the sellers that would support a conspiracy conviction. Delvin testified that Fugate approached him when Delvin first arrived in Indiana and asked him if he could acquire some cocaine for resale. Fugate also negotiated the sale of cocaine to Sullivan and participated in the final conversation in the house preceding the exchange. The testimony of Delvin and Sullivan fully supports the jury's conclusion that Fugate was an active participant in the conspiracy.

Fugate also contends, citing his own testimony, that his participation in the conspiracy was involuntary because Delvin allegedly threatened bodily harm if he refused to cooperate. Delvin, however, testified that it was Fugate's vision of quick profit that set the enterprise in motion. Sullivan's testimony concerning Fugate's active role also belies Fugate's claim that he was merely the helpless pawn of a tyrannical Delvin. In essence, Fugate alleges that the jury should have found that he was a more credible witness than Delvin or Sullivan. As we have noted earlier, the jury's evaluation of the credibility of witnesses will remain undisturbed absent extraordinary circumstances. *See Beverly*, at 360 (quoting *United States v. Hogan*, 886 F.2d 1497, 1502 (7th Cir.1989)); *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); *United States v. D'Antonio*, 801 F.2d 979, 982 (7th Cir.1986). Fugate failed to cite anything extraordinary about the testimony of Delvin or Sullivan that would compel us to disturb the jury's evaluation of their credibility.

### III. CHARLES CAUDILL'S MOTION FOR SEVERANCE

■ Charles contends that the district court's denial of his motion to sever his trial from that of his codefendants Fugate and Icenhouer was an abuse of discretion. In *United States v. Brown*, 870 F.2d 1354, 1360 (7th Cir.1989), we noted that "[a] motion for severance is typically waived if it is not renewed at the close of evidence, primarily because it is then that any prejudice which may have resulted from the joint trial would be ascertainable." Charles neglected to renew his severance motion at the close of the evidence. Moreover, the defendant also failed to demonstrate that refiling would have been a futile exercise, a showing that may have excused him from the requisite renewal of his motion. *Id.* Despite the defendant's failure to preserve the severance issue for review, it is apparent that his claim of entitlement to a separate trial is without merit.

■ Essentially, Charles claims that he should not have been tried with Fugate and Icenhouer because he "did not participate in the same act or transactions as the other defendants." The defendant elaborates on this statement by alleging that "[t]here simply was no evidence of joint participation by Charles Caudill with any of the other codefendants." As we have noted in our discussion of Charles' sufficiency of the evidence challenge, the allegations in the indictment of Charles' role in the conspiracy were fully supported by the testimony of Sullivan and Delvin. Charles' motion filed in district court argued alternatively that he was entitled to a separate trial because of misjoinder under FED.R. CRIM.P. 8(b) [4] or prejudice as described in FED.R.CRIM.P. 14.[5]

Charles' claim of misjoinder was implausible—the indictment clearly alleged that all three defendants were involved in the same conspiracy. A joint trial of co-con-

4. Rule 8(b) provides:

**Joinder of defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the

defendants need not be charged in each count.

5. Rule 14 provides in part:

If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

spirators is presumptively appropriate, *United States v. Bond,* 847 F.2d 1233, 1240 (7th Cir.1988), and the indictment's single charge against all three defendants clearly satisfied FED.R.CRIM.P. 8(b). On a motion for severance pursuant to FED.R.CRIM.P. 14 we defer to the district court, which is in the best position to assess the benefits and hazards of a joint trial, and will only reverse when a defendant has clearly shown that the trial court abused its discretion. *Id.; United States v. Oxford,* 735 F.2d 276, 279 (7th Cir.1984). While there are inherent risks in all joint trials, a court must balance this risk against the great benefit joint trials confer to the judicial system. *Bond,* 847 F.2d at 1240; *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir. 1987). Considering the ample testimony of Charles' participation in the conspiracy, which was the solitary charge against all three defendants, the district court properly exercised its discretion when denying the defendant's severance motion.

## IV. THE GOVERNMENT'S LATE PRODUCTION OF THE ICENHOUER TAPE

Defendant Icenhouer's only challenge to his conviction is a claim that the district court erred when it admitted a tape recording of a conversation between Icenhouer and Delvin. While the government had informed defense counsel that it had taped Icenhouer discussing the drug deal with Delvin, the government was unable to locate and produce the tape for the defendant until it was discovered at noon on the first day of trial. Sullivan and Barile had completed their testimony before the government found the tape. After the discovery of the tape, the defendant moved for a mistrial in the district court claiming that his cross-examination of Barile, which concerned the reasons for recording conversations between an informant and conspirators, resulted in irremediable prejudice to Icenhouer now that the government had produced the Icenhouer–Delvin tape. Icenhouer essentially argues that the only way the district court could have remedied the late disclosure of the tape was to preclude its admission into evidence.

■ Rule 16(d)(2) of the Federal Rules of Criminal Procedure provides the following remedies for the government's failure to comply with its duty under Rule 16:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

The remedy for nondisclosure is within the sound discretion of the district court, and we will reverse because of the remedy chosen only where the trial court abused its discretion and such abuse was "prejudicial to the substantial rights of the defendant." *United States v. Koopmans,* 757 F.2d 901, 906 (7th Cir.1985) (citing *United States v. Bastanipour,* 697 F.2d 170, 175–76 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983)). We find that Icenhouer has failed to show prejudice and that the district court did not abuse its discretion in admitting the tape recording.

■ Icenhouer's claim of prejudice from the few questions he asked Barile on cross-examination concerning the need for tape recordings to verify an informant's version of conversations with codefendants is exaggerated. Defense counsel's cross-examination of Barile concerning the desirability of wiring informants was only raised when defense counsel was discussing *Sullivan's* role as an informant, not that of Delvin, who was the conversant with Icenhouer on the tape. Barile's responses would undermine the government's case to the extent they highlighted the government's failure to record Sullivan's conversations on the day of the arrest. The record reveals that defense counsel's limited cross-examination of Barile concerned only Sullivan and would only be understood by the jury as casting doubt on the accuracy of Sullivan's version of conversations furthering the conspiracy. The claim that defense counsel's line of questioning was a subtle attack

on the unavailability of the Icenhouer–Delvin tape strains credulity.

The government informed defense counsel of the existence of the Icenhouer–Delvin tape (and the substance of the recorded conversation) at an early stage of the proceedings and informed defense counsel of its continuing search for the misplaced tape. At no point did the government represent that it would abandon its efforts to find the tape, and it promptly turned the tape over to defense counsel when the tape was discovered. When the tape was found, the district judge gave defense counsel time to review the tape prior to Delvin's testimony the following day. Defense counsel never sought a continuance to prepare for Delvin's testimony and claims no prejudice in cross-examining Delvin. We find that the district court did not abuse its discretion when it admitted the tape recording and refused to grant a mistrial.

### V. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions of each defendant.