21 F.3d 431
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Roy VINSON, Jr., Defendant-Appellant.
 No. 93-1234.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 7, 1994.
Decided April 8, 1994.
 
 Before COFFEY, FLAUM and MANION, Circuit Judges.
 
 ORDER
 
 1
 Roy Lee Vinson, Jr. ("Vinson") was found guilty by jury of one count of conspiracy to commit robbery, in violation of 18 U.S.C. Sec. 371, two counts of interference with commerce by robbery, in violation of 18 U.S.C. Sec. 1951, two counts of using a firearm during the commission of a robbery, in violation of 18 U.S.C. Sec. 924(c)(1), and one count of possession of a stolen motor vehicle, in violation of 18 U.S.C. Sec. 2313. Vinson was sentenced to 240 months (20 years) imprisonment, with an additional consecutive 300 months (25 years) imprisonment on the firearm counts, for a total sentence of 540 months (45 years). On appeal, Vinson challenges his convictions as being unsupported by sufficient evidence. In the alternative, Vinson argues that the district court committed reversible trial error both in refusing to give a tendered instruction, and in imposing the mandatory 20-year consecutive sentence for his second conviction under 18 U.S.C. Sec. 924(c)(1). For the following reasons, we reject Vinson's contentions and affirm the judgment of the district court in its entirety.
 
 I.
 
 2
 The conspiracy in this case, which came into being on or about June, 1991, led to a series of four robberies, three of which were aimed at armored car couriers. The original group of coconspirators consisted of four people, Clinton Parker, a/k/a "Spanky," who was an Indiana State Policeman, Leo Reese, Edgar Rogers, and Lawrence Richmond. The pattern of these robberies was generally the same: Parker would "lend" Rogers his 9 mm service weapon. Parker and Rogers would then drive to a shopping mall where Rogers would steal a vehicle. Rogers would then drive the stolen car to homes of the other coconspirators, and together, they would drive to a prearranged target. Once there, Rogers would wait in the stolen car while the other two went inside the store to wait for the courier. Once he arrived, the two would wait until he received the store's deposit, at which point they would rob him in the store, escape out the store's back door into the waiting car, and speed away to a prearranged location (usually the home of another coconspirator) to split the loot. In this manner, the conspiracy successfully robbed two different Builder's Squares stores on July 27, 1991, and October 26, 1991, a Val-U-Mart grocery store on January 18, 1992, and K-Mart on February 15, 1992.
 
 
 3
 The issue before the jury was whether or not Vinson was a participant in these crimes. According to the indictment handed down by the grand jury, Vinson joined the conspiracy in time to participate in the second Builder's Square robbery of October 26, 1991, as well as the robberies at Val-U-Mart and K-Mart; however, since he was found guilty only in connection with the last two robberies, we proceed to the facts surrounding those events.
 
 
 4
 On January 18, 1992, Parker drove Rogers to a shopping center in Calumet City, Indiana, where Rogers stole a 1990 Chevrolet Suburban. Rogers drove the stolen car to Vinson's home and picked up Vinson, Richmond, and another defendant, Montrel Ingram a/k/a "Crunch." The group then drove to a prearranged location where they met Parker who was waiting for them in his squad car. Parker handed them his 9 mm service weapon and a police scanner. Thus equipped, the group left and headed to the Val-U-Mart grocery in Gary, Indiana. When they arrived, Vinson and Ingram went into the store to commit the robbery, while Richmond stayed outside and guarded the front door. Rogers waited in the getaway car. The plan was that Vinson and Crunch would lure the store's security guard to the back of the store where they would force him to open the store safe. When this did not work, Vinson and Crunch left the store, discussed what to do and then reentered the store. Upon reentry, Vinson and Crunch took the security guard, William Brooks, at gunpoint to the courtesy booth where the store's manager, John Dudley, was counting the evening's receipts. Vinson and Crunch demanded the money and ordered Brooks and Dudley to the front of the store, with Dudley carrying the money in a money tray. Once outside, Vinson, Richmond and Crunch took the money tray from Dudley, hopped into the waiting car, and fled to a prearranged place where they met Parker who, again, was waiting for them in his squad car. Vinson, Richmond, and Crunch took the money tray, guns, and police scanner out of the Suburban and got into Parker's police car. Parker told Rogers to drive the Suburban to a certain location. Rogers did as instructed and Parker followed in his police car. When they arrived, Parker handed Rogers some police flares which Rogers used to torch the Suburban. After the car had been lit, Rogers got into Parker's car, and together, they went to Vinson's home to split the proceeds of the robbery.
 
 
 5
 The February 15, 1992 robbery pretty much tracked the same pattern of the previous robberies. On that day, Parker drove Rogers to a Venture store in Griffith, Indiana, where Rogers stole a Chevrolet pickup truck. Rogers swung back by Parker's home and Parker again handed over his 9 mm service weapon and police scanner. Rogers drove the stolen truck back to his home, picked up Richmond, and then picked up Vinson at his home. The group then proceeded to the K-Mart in Merrillville, Indiana. Richmond went into the store while the other participants waited outside for the armored car courier to arrive. When the courier arrived, Vinson entered the store and informed Richmond. The two took up positions one aisle over from each other near the back of the store where the defendants knew the courier would pass after he had picked up the money from the store's safe. When the courier emerged from the store's office with the deposit, Vinson approached the courier from behind and wrestled him to the ground; at the same time, Richmond took the courier's .357 revolver and the deposit. Both defendants then fled to the rear of the store in hopes of escaping through two different fire exits. Much to their dismay, both exits were locked. In their search for an escape, Vinson and Richmond came upon some employees. One of the defendants pointed his gun at one of the employees and asked her for the keys to the fire exits. When the employee stated that she did not have the keys, the defendants ran to the front of the store. After leaving the store, Vinson and Richmond split up, Richmond going to the rear of the building where he thought that Rogers was waiting, and Vinson going into the store's parking lot where Rogers, in fact, was waiting. Rogers and Vinson sped away. Richmond fled on foot but was later arrested by an off-duty police officer.
 
 
 6
 On June 22, 1992, a federal grand jury returned an eleven-count indictment charging Vinson and the others with various offenses. Count 1 charged Vinson with conspiracy to commit robbery, in violation of 18 U.S.C. Sec. 1951, conspiracy to transport stolen vehicles, in violation of 18 U.S.C. Sec. 2312, and conspiracy to possess and dispose of motor vehicles that had crossed state lines after having been stolen, in violation of 18 U.S.C. Sec. 2313, all of which was in violation of 18 U.S.C. Sec. 371. Counts 3, 4 and 5 charged Vinson, as an aider and abetter, pursuant to 18 U.S.C. Sec. 2, of robbery, in violation of 18 U.S.C. Sec. 1951. Counts 7, 8, and 9 charged Vinson, as an aider and abetter, in violation of 18 U.S.C. Sec. 2, with using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. Sec. 924(c)(1). Counts 10 and 11 charged Vinson, as an aider and abetter, pursuant to 18 U.S.C. Sec. 2, with possessing and disposing of motor vehicles which had crossed state lines after having been stolen, in violation of 18 U.S.C. Sec. 2313. All of the codefendants pleaded guilty except Vinson, who proceeded to trial.
 
 
 7
 At trial, the jury heard the testimony of Vinson's codefendants who, pursuant to their plea agreement with the government, testified to Vinson's involvement in the conspiracy. The jury also heard testimony from two K-Mart employees who both identified Vinson in court as one of the two robbers. After the government's presentation of evidence, Vinson, pursuant to Fed.R.Crim.P. 29, moved for a judgment of acquittal, which the district court denied. Vinson then presented his evidence, and after the conclusion of all the evidence, made another motion for acquittal, which was also denied. Following a three-day trial, the jury, on October 21, 1992, found Vinson not guilty on all of the charged offenses surrounding the October 26, 1991 robbery of Builder's Square, and guilty on all of the charged offenses surrounding the January 18, 1992 robbery of Val-U-Mart and the February 15, 1992 robbery of K-Mart. On January 22, 1993, the district court entered its sentencing order. On that same day, Vinson filed his timely notice of appeal.
 
 II.
 A. Sufficiency of the Evidence
 
 8
 Vinson first argues that there was insufficient identification evidence to support any of his convictions arising out of the events surrounding the robberies of Val-U-Mart and K-Mart. Vinson took the necessary first step in preserving this issue for appeal by renewing his motion for judgment of acquittal at the conclusion of all the evidence. See, e.g., United States v. Pless, 982 F.2d 1118, 1122 (7th Cir.1992) (to preserve challenges to the sufficiency of the evidence, defendants must renew motions for judgment of acquittal at close of all the evidence or via a post-trial motion within the seven-day period as provided by Fed.R.Crim.P. 29(c); if not, the issue is waived and will only be reviewed for a "manifest miscarriage of justice"); United States v. Caudill, 915 F.2d 294, 296 (7th Cir.1990) (same). Even so, Vinson still has a tough row to hoe because when a defendant challenges the sufficiency of the evidence, "we will affirm if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Walker, 9 F.3d 1245, 1249 (7th Cir.1993) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original). "We make this determination by viewing the evidence and the reasonable inferences which can be drawn therefrom in the light most favorable to the government." Id.
 
 
 9
 In support of his argument, Vinson emphasizes that the bulk of the government's identification evidence came from the testimony of the other codefendants who testified against him pursuant to their plea agreements with the government. Vinson claims, without offering this court any authority, that this type of testimony is inherently suspect and should therefore not provide the sole basis for his convictions. Initially, we note that, at least with respect to the K-Mart robbery, the government presented other evidence besides the testimony of the codefendants. The government offered the testimony of two K-Mart employees, Maria Lukovic and Daniel Holden, who both positively identified Vinson in court as one of the two men who, on the day of the robbery, pointed a gun at them and asked for the keys to the fire exits. Therefore, without regard to the codefendants' testimony, this in-court identification evidence, by itself, was sufficient for the jury to conclude beyond a reasonable doubt that Vinson was a participant in the K-Mart robbery.[1]
 
 
 10
 Even without this additional in-court testimony, the testimony of a coconspirator testifying pursuant to a plea agreement is sufficient to support a guilty verdict. This Circuit has stated that "[u]nless testimony is 'inherently unbelievable,' a guilty verdict may based on the testimony of a coconspirator testifying pursuant to a plea agreement." United States v. Jewell, 947 F.2d 224, 231 (7th Cir.1991) (citations omitted). And from our review of the trial transcript, we see nothing "inherently unbelievable" about the other codefendants' testimony. At trial, each codefendant gave lucid and rational testimony, detailing Vinson's involvement in the various robberies. Furthermore, the details of each codefendant's plea agreement, including the exchange for truthful testimony, as well as the avoidance of lengthy prison sentences, were revealed to the jury and were subjected to vigorous cross-examination by Vinson's attorney. Indeed, Vinson's attorney quite capably brought out the fact that two of the testifying codefendants, Parker and Rogers, had given testimony at Vinson's trial that was inconsistent with testimony that each had given at their respective guilty plea hearings. But despite the efforts of Vinson's trial counsel, the jury ultimately determined that the codefendants were credible. This determination was the jury's to make and we will not disturb it. See Jewell, 947 F.2d at 231 ("Credibility is for the jury, not this court, to determine.") (quotations omitted).
 
 
 11
 Vinson responds that the jury must not have been that convinced of the other codefendants' credibility since it acquitted Vinson of all charges stemming out of October 26, 1991 Builder's Suqre robbery, even though the government offered the same evidence--the codefendants' testimony--in support of that robbery as it did in support of the robberies at Val-U-Mart and K-Mart. This, of course, goes not to the sufficiency of the evidence, but the apparent inconsistency of the jury's verdicts. We first point out that since Vinson did not challenge the purported inconsistency below--in that he chose to take an immediate appeal, instead of challenging this in a post-trial motion--this objection is waived. See Walker, 9 F.3d at 1248. Even so, "an irreconcilable jury verdict does not warrant reversal of a criminal conviction." Id. This is because "each count in an indictment is to be considered as a separate indictment." Id. Moreover, Vinson's implicit argument, that he was somehow prejudiced, does not necessarily follow from the jury's inconsistency. It could just as easily be argued that Vinson was the recipient of the jury's own version of justice. Through Vinson's trial counsel's efforts, the jury was informed that Vinson would face an additional 20-year consecutive sentence for the second and each subsequent conviction for using a gun in the robberies. Perhaps the jury, having already determined that Vinson was a participant in the events at Val-U-Mart and K-Mart, may have "through ... lenity, arrived at an inconsistent conclusion" with respect to the second Builder's Square robbery. Id. (citation omitted). In any event, neither this inconsistency, nor any of Vinson's other challenges, provide us with a reason to set aside the jury's ultimate determination that Vinson was guilty beyond a reasonable doubt of all the charges surrounding the Val-U-Mart and K-Mart robberies.
 
 
 12
 B. Refused Jury Instruction: Theory of the Defense
 
 
 13
 Vinson also claims that the district court committed reversible error when it refused to give an instruction on his theory of the defense. The refused instruction, Defendant's Instruction No. 7, reads as follows:
 
 
 14
 Mere acquiescence or silence or failure to perform a duty does not make one a participant in a conspiracy unless it is proven that Defendant, Roy Lee Vinson, Jr., acted or failed to act with knowledge of the purpose of the conspiracy and with a view of protecting and aiding it.
 
 
 15
 The district court refused to give Vinson's tendered instruction because Vinson failed to support this instruction with any authority from this Circuit. Vinson claims that by not giving this instruction, the district court failed to adequately instruct the jury on Vinson's theory of defense, namely, that he was merely an acquaintance of the other codefendants, and that this acquaintance "provided the basis for the co defendant's [sic] ability to identify him and eventually fabricate his alleged role in the offense."
 
 
 16
 In order to preserve this issue for review, however, it was Vinson's duty, pursuant to Fed.R.Crim.P. 30, to object to the judge's refusal to tender his instruction and clearly state that the tendered instruction was his theory of defense. Vinson raised no objection--at all--to the district court's refusal to give instruction No. 7. Thus, we review the district court's refusal for plain error. See United States v. Canino, 949 F.2d 928, 940 (7th Cir.1991), cert. denied, 112 S.Ct. 1701 (1992) (failure to state in an objection that the tendered instruction constituted the defendant's theory of the defense "waive[s] all but prejudicial error."). To constitute plain error, the district court's refusal "must be of such a great magnitude that it probably changed the outcome of the trial, or ... result[ed] in a miscarriage of justice." Id. at 940-41 (citations omitted).
 
 
 17
 There was no plain error here. First, to the extent it was necessary to instruct the jury that "mere association" does not constitute "intentionally and knowingly joining" a conspiracy, this was already covered by the court's instruction No. 19-A, which provided: "Mere association with conspirators or those involved in a criminal enterprise is insufficient to prove defendant's participation or membership in a conspiracy." This instruction was clear and adequately instructed the jury that Vinson had to have done more than merely associate with the other codefendants before he could be found criminally liable. Second, as detailed above, there was overwhelmingly sufficient evidence showing that Vinson was not a hapless, innocent associate of the codefendants, but rather, an active participant in the robberies at Val-U-Mart and K-Mart. In the light of the evidence, as well as the other instructions actually given, we conclude that the court's refusal to give Vinson's instruction did not change the outcome of the trial or constitute a miscarriage of justice.
 
 
 18
 C. "Second or Subsequent" Firearm Count under 18 U.S.C. Sec. 924(c)(1)
 
 
 19
 Finally, Vinson claims the district court misinterpreted 18 U.S.C. Sec. 924(c)(1) in imposing a twenty-year consecutive sentence for his conviction on the "second or subsequent" firearm count. Under Sec. 924(c)(1), a person using or carrying a firearm during a crime of violence (which includes robbery) shall receive a five-year sentence which runs consecutive to any other term of imprisonment. In the case of a "second or subsequent conviction" under Sec. 924(c)(1), the defendant "shall be sentenced to imprisonment for twenty years...." 18 U.S.C. Sec. 924(c)(1). Vinson claims that since both Sec. 924(c)(1) counts were charged in the same indictment, the second Sec. 924(c)(1) conviction cannot be a "second or subsequent conviction" within the meaning of the statute, and that he should therefore not be subject to that statute's twenty-year enhanced sentence. The Supreme Court in Deal v. United States, 113 S.Ct. 1993 (1993), recently considered and squarely rejected the very same argument in affirming a 105-year sentence for six Sec. 924(c)(1) convictions arising out of the same indictment. This is admittedly a harsh result, but "Congress designed this very punitive sentence structure" to deal with persons who repeatedly use guns in offenses. See United States v. Harris, 2 F.3d 1452, 1456 (7th Cir.), cert. denied, 114 S.Ct. 451 (1993). Thus, we are bound to follow Congress' and the Supreme Court's directive and affirm the district court's imposition of the additional 20-year sentence.
 
 III. Conclusion
 The judgment of the district court is
 
 20
 AFFIRMED.
 
 
 
 [1]
 Vinson challenges the validity of this in-court identification because neither witness was able to positively identify Vinson at in-person and photo lineups conducted shortly after the robbery. However, this court has noted that, at least with respect to prior photo lineups,
 the fact that eye witnesses to an occurrence cannot make a positive identification of an individual from an examination of photographs of a number of persons does not ... detract from the validity of their in-court identification where they see the individual in person. The weight to be given to their in-court identification is for the jury to determine.
 United States v. Briggs, 700 F.2d 408, 413 (7th Cir.), cert. denied, 461 U.S. 947 (1983) (citation omitted).