In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3921

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT ROLLINS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 771-1—**William J. Hibbler**, *Judge.*

ARGUED APRIL 11, 2002—DECIDED AUGUST 19, 2002

Before CUDAHY, DIANE P. WOOD, and EVANS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Robert Rollins was charged with four counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and four counts of using/carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Rollins pleaded not guilty and was convicted at trial on all counts. Rollins now appeals, challenging the district court's decisions (1) not to sever the counts of the indictment, (2) not to exclude "other crimes" evidence under Rule 404(b) of the Federal Rules of Evidence, (3) not to dismiss the case against Rollins on the novel theory that the passage of the National Emergency Act in 1976 resulted in the repeal of the federal bank

robbery statute. We now AFFIRM the judgment of the district court.

## I.

Robert Rollins committed a bank robbery in Independence, Missouri and was subsequently apprehended. In a proffer, later repudiated, Rollins apparently admitted to four armed bank robberies in Chicago during the preceding months. The robberies in Chicago occurred between December 30, 1998 and February 19, 1999. The Missouri robbery occurred eleven days after the last Chicago robbery. Rollins was eventually indicted for the Chicago robberies and charged with four counts of bank robbery, 18 U.S.C. § 2113(a), and four related counts of using/carrying a firearm in a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii). Rollins pleaded not guilty, and the case was tried before a jury.

Before trial, Rollins made a motion to sever the indictment and order separate trials for each of the four robberies. The government, however, persuaded the district court to permit joinder of the criminal counts and, pursuant to Rule 404(b) of the Federal Rules of Evidence, to allow "other crimes" evidence from the Missouri bank robbery. The government argued that evidence from the Missouri robbery, in combination with Rollins' statements during his proffer on April 14, 1999, demonstrated a common *modus operandi* for all five robberies and a developing knowledge of the banks' security measures.

Because the legal issues in this case turn on factual parallels among five bank robberies (four of them specified in the indictment), we will describe chronologically the testimony and evidence related to each crime. At the outset, we identify the salient features, reflected in evidence, that emerge from most, if not all, of the robberies: (1) the donning of thick, dark-framed glasses (described by one

victim teller as "make believe"); (2) the wearing of a beige, three-quarter length down coat, which was positively identified as a government exhibit after it was recovered from the Rollins' home; (3) the ruse of asking seemingly innocuous customer questions before and during the robberies; (4) the use of a handgun that was "mostly black," black and silver, or black and grey; (5) the description of the robber by witnesses as a medium to dark complected African-American male, approximately 5'10" to 6'0" tall, with a thin build and a narrow face; and (6) positive courtroom identifications of Rollins by victim bank tellers.

## A.

The first robbery occurred on December 30, 1998 at the Metropolitan Bank on South Archer Avenue in Chicago. Based on the trial testimony of bank employees, certain information about this heist is known. The perpetrator was an African-American male approximately twenty-five to thirty years old, 5'10" to 5'11" in height and weighing 140 to 160 pounds. He was wearing black gloves and big, black-framed glasses, and he approached the teller counter to ask for change. The teller asked the robber for an account number, and the robber in turn handed the teller a note demanding money. After the teller emptied her drawer, the perpetrator took the money and left. Several months later, the teller picked Rollins' photo out of a photo lineup. She also positively identified Rollins at trial.

## B.

The second robbery occurred on the morning of January 14, 1999 at the North Community Bank on North Broadway. Based on the trial testimony of bank employees, certain information is known about this robbery. Two rob-

bers entered the bank, with one approaching the desk of a personal banker and the other walking to a teller window. The teller reported that the robber who approached his window was a medium-complected African-American male with brown eyes, in his mid-twenties, approximately 5'10" to 5'11" in height and with a skinny build and a skinny face. The robber was wearing black-framed glasses and a down, mid-length cream and gray coat with a hood. He was also carrying an Eastpack-brand book bag with red strings hanging off the zipper. After initially asking some questions about opening a savings account, the robber pointed a black and gray automatic handgun at the teller and demanded money. The teller complied but also gave the robber a dye pack of fake money, designed to explode once it left the bank.

When another teller approached the same window, the robber demanded the contents of his cash drawer as well. While this money was being inserted into the black book bag, the first teller hit a silent alarm button that notified the police of a robbery in progress; the button also activated a bank camera. Unaware that his actions were now being recorded, the robber then demanded the contents of a third teller's drawer. At trial, the third teller testified that the perpetrator was a dark-complected African-American male in his early twenties, approximately 5'10" to 6'0" tall, having a lean build with an elongated face, and wearing a baseball cap; dark, thick-framed glasses; and a cream and navy down, mid-length hooded coat.

While the robbery was underway, the robber at the teller window approached his accomplice who was at the personal banker's desk and asked him if everything was all right before returning to the teller window. At this point, the personal banker had a clear view of the face of the robber who had approached the teller. The personal banker stated that this robber was 5'10" to 5'11" in

height with a slim build and a narrow face. He was wearing oversized round glasses and a three-quarter length, light and dark multi-colored winter coat.

After getting the money, the robber at the teller window asked the first teller questions about the Chicago Bulls and Michael Jordan. The robber then slowly stepped back, and he and his accomplice slowly left the bank.

The personal banker and two of the tellers all picked out Rollins from an FBI photo lineup. All three bank employees also positively identified a coat recovered from Rollins' home as the coat worn by the robber who approached the teller window. At trial, two of these employees also identified Rollins as this robber. Finally, one of the tellers also testified that a black book bag recovered from Rollins' home appeared to be identical to the distinctive book bag used in the robbery.

## C.

The third robbery occurred in the early afternoon of January 14, 1999, at the Metropolitan Bank on South Archer Avenue. It is noteworthy that this crime involved the same bank as the first robbery (South Archer) and occurred only two hours after the second robbery (at North Community on Broadway). According to the trial testimony of the victim teller, the robber was a dark-complected African-American male in his early twenties, approximately 5'8" to 5'9" with a thin build, a thin face and brown eyes. He was also wearing thick-framed black or brown glasses and a beige coat with navy blue at the bottom and on the elbows. Similar to the first robbery, the perpetrator initially approached the teller window and asked for some change. The robber then pulled out a black semi-automatic pistol and pointed it at the teller. However, the teller quickly ducked behind a brick well and triggered an alarm inside the bank vault area. On a

nearby video monitor, the teller then observed the robber leave the bank.

The victim teller later positively identified Rollins from a photo line-up. At trial, the same employee also identified Rollins as the robber. Finally, she also testified that the robber was wearing the coat (introduced as a government exhibit), which had previously been recovered from Rollins' home.

## D.

The fourth robbery was staged on February 19, 1999, at the North Community Bank on Belmont Avenue. According to trial testimony from the victim teller, the robber was a dark-complected African-American male in his mid-twenties and approximately 6'3" to 6'4" in height with a thin build. The victim teller also testified that the robber was wearing a long beige jacket with green and blue colors in it, a black hat and black, thick-framed "make believe" glasses. Another bank employee, who was stationed approximately ten feet away, described the robber as an African-American male in his late twenties or early thirties, approximately 6'0" tall with a skinny to medium build, and wearing thick, dark-framed glasses, a baseball cap and a down, three-quarter length coat with green in it.

The robber initially asked the teller for rolls of quarters. As the teller was complying with this request, the robber placed a gun that was black with a gray handle on the counter and demanded money. The contents of the top money drawer (the "display drawer") were then handed over, but the robber also demanded the contents of a second drawer that he knew about. The teller immediately complied. Throughout the staging of the robbery, the robber continued to ask questions about opening an account. As the teller was clearing out the contents of her drawers,

the robber told her that he did not want the singles. However, he also noticed a package of money that was still in the top drawer and said that he wanted it. In fact, this last pack of money was equipped with an exploding dye pack, which burst open shortly after the robber left the bank.

At trial, the victim teller positively identified Rollins as the bank robber. She also testified that the beige coat (a government exhibit) was identical to the coat the robber was wearing. The other bank employee witness could not positively identify the coat, but she stated that the coat in evidence had the same green color on the inside that she remembered as being inside the robber's coat, which was open during the robbery.

Jacqueline Wiley, the girlfriend of Rollins' friend Cordell Smith, provided additional incriminating evidence with respect to the February 19th robbery (the fourth robbery). Wiley testified that sometime after Valentine's Day, 1999, she, Rollins and Smith drove to a bank and parked in the lot behind it. Rollins put on a dark baseball hat, brown big-framed glasses, gloves and a coat. He then took out a silver and black handgun and got out of the car. When Rollins returned fifteen minutes later, he threw money at her and requested that she count it. Wiley further testified that both the money and Rollins' hands were soiled with green ink.

### E.

A fifth robbery occurred on March 2, 1999, at the Mercantile Bank in Independence, Missouri. Although this crime was not included in the indictment (Rollins had already pleaded guilty to this offense), the district court admitted this evidence on the theory that it displayed the same *modus operandi* as the Chicago robberies. The victim teller testified that the robber was a medium-

complected African-American male, in his early to mid-twenties, approximately 5'10" tall with a thin build, and wearing big dark-framed glasses. The teller's supervisor, who was standing next to the teller at the time of the robbery, testified that the robber was a dark-complected African-American male in his early to mid-twenties, about 6'0" tall, with a slender build. The robber initially approached the teller's window and asked for change. As the teller complied with this request, the robber pulled a "mostly black" handgun from a black travel bag and laid it on the counter with its barrel pointed at the teller. The robber then told the teller that he wanted hundreds and twenties, that he did not want any of the bait money that triggered a silent alarm and that he wanted the money out of both the top and second drawer. The teller complied with the request, but did not hand over either the bait money or the dye pack since the robber seemed familiar with these bank security measures. Throughout this process, the robber continued to ask, in a quiet tone, various customer questions about opening an account.

Shortly after the crime, both the teller and bank supervisor positively identified Rollins from a photo lineup. At trial, both of these individuals also identified Rollins as the robber.

F.

After the government completed its case-in-chief, Rollins took the stand in his own defense. He denied committing the four Chicago bank robberies but admitted that he robbed the Mercantile Bank in Independence, Missouri on March 2, 1999. (It is noteworthy that Rollins had already pleaded guilty to this offense.) Rollins acknowledged that during the Missouri robbery, he wore glasses and a hat, carried a gun and asked the teller for change.

After being shown a surveillance photo of the fourth Chicago robbery (February 19), Rollins agreed that he and the robber had remarkably similar features and donned the same type of coat. During cross-examination, Rollins was specifically asked about statements he had made to police following his arrest in Missouri, including his admission that he committed four previous bank robberies in Chicago. In response, Rollins either denied making these statements, claimed a blank memory or that he was coerced by police.

In rebuttal, the government called FBI Agent Paul Grudek. Grudek testified that in the course of the April 14, 1999, proffer, Rollins admitted to committing all four Chicago robberies and that Rollins provided detailed information about each crime.

At the close of trial, Rollins' counsel did not renew his motion to sever. The jury returned a guilty verdict on all eight counts of the indictment. The district court then sentenced Rollins to 106 years imprisonment and ordered him to pay approximately $12,000 in restitution. Rollins now appeals his conviction, arguing that the district court erred when it (1) failed to sever the multiple-count indictment and to conduct separate trials on the four robberies, (2) admitted evidence of the Missouri robbery, pursuant to Fed. R. Evid. 404(b), and (3) failed to dismiss all charges for want of federal jurisdiction.

II.

The denial of a motion to sever counts of an indictment is reviewed for an abuse of discretion. *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000). A district court's admission of Rule 404(b) evidence is also reviewed for an abuse of discretion. *United States v. Denberg*, 212 F.3d 987, 992 (7th Cir. 2000). Finally, a determination of federal jurisdiction is reviewed de novo. *Manley v. City of*

*Chicago*, 236 F.3d 392, 396 (7th Cir. 2001). Rollins' three grounds for appeal will be addressed in order.

A.

The first issue on appeal is whether the district court abused its discretion by failing to sever the eight-count indictment. Rollins claims that the district judge should have ordered separate trials for each of the four Chicago robberies, thus charging Rollins with one § 2113(a) bank robbery count and one § 924(c)(1)(A) firearm count for each criminal episode. Rule 8(a) of the Federal Rules of Criminal Procedure permits the joinder of multiple offenses "if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two more actions or transactions connected together or constituting parts of a common scheme or plan." Rollins concedes that circumstances surrounding the four Chicago robberies satisfy the requirements of Rule 8(a).[1] Nonetheless, he contends that he was entitled to severance under Rule 14 because

---

[1] The rules pertaining to joinder (Rule 8) and severance (Rule 14) are, of course, related, but ultimately mandate different standards of review. A challenge to a Rule 8(a) joinder of offenses is reviewed de novo. *United States v. Quilling*, 261 F.3d 707, 713-14 (7th Cir. 2001). However, "our cases have emphasized that district courts 'should construe Rule 8 broadly to allow joinder to enhance the efficiency of the judicial system, . . . and to avoid expensive and duplicative trials, if judicial economy outweighs any prejudice to the defendant.'" *United States v. Koen*, 982 F.2d 1101, 1111 (7th Cir. 1992) (quoting *United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir. 1988)). In the event "joinder [under Rule 8] is deemed proper, we shall reverse a district court's denial of a [Rule 14] severance motion only upon a showing of a clear abuse of discretion." *Quilling*, 261 F.3d at 714.

the joinder inevitably compromised his right to a fair trial.[2] *Cf. United States v. Koen*, 982 F.2d 1101, 1112 (7th Cir. 1992) (noting that, even when joinder under Rule 8 is proper, "Rule 14 authorizes the district court to grant a severance when it appears that a defendant's trial will be prejudiced by the joinder of either offenses or defendants"). At the outset, we note that "'Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts.'" *United States v. Moore*, 115 F.3d 1348, 1362 (7th Cir. 1997) (quoting *Zafiro v. United States*, 506 U.S. 534, 541 (1993)).

Rollins' first, and perhaps insurmountable, obstacle is the fact that he failed to renew his motion to sever at the close of the evidence. *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001) (holding that defendant waives severance motion when he fails to renew it at the close of evidence). The timing of the motion is important because the close of evidence is the moment when the district court can fully ascertain whether the joinder of multiple counts was unfairly prejudicial to the defendant's right to a fair trial. *See id.*; *United States v. Caudill*, 915 F.2d 294, 298 (7th Cir. 1990). Moreover, the requirement to renew has the effect of discouraging strategic choices by

---

[2] Rule 14 of the Federal Rules of Criminal Procedure provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

criminal defendants who would prefer to wait for a verdict before renewing their severance arguments, thus wasting valuable judicial resources. *See United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991) ("We cannot countenance a system in which a defendant first tries to see whether he can get an acquittal in a joint trial, and then when he is convicted renews his motion to sever so that he can have another crack at a jury."); *accord Phillips*, 239 F.3d at 838. If a claim has been waived, there is generally no appellate review. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Penny*, 60 F.3d 1257, 1261 (7th Cir. 1995). Rollins offers no argument why this rule should not be applied to the case before us.

Yet even if Rollins' severance claim has not been waived, his appeal is meritless. Because Rule 14 assigns to the district court the task of balancing the cost of multiple trials against the possible prejudice inherent in a single trial, a defendant bears "an extremely difficult burden" of showing that the district court abused its discretion. *Moore*, 115 F.3d at 1361-62 (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 754 (7th Cir. 1988)). In order to prevail on this issue, a defendant must demonstrate that the denial of severance caused him "actual prejudice" that deprived him of his right to a fair trial; it is insufficient that separate trials would have given a defendant a better opportunity for an acquittal. *United States v. Quilling*, 261 F.3d 707, 715 (7th Cir. 2001); *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998). In this case, Rollins claims that the combination of the relatively scant evidence from each individual robbery confused the jurors and that, but for the intermingling of evidence from one count to the next, he never would have been convicted of a single count viewed separately. However, Rollins fails to acknowledge that most if not all of this evidence would have nonetheless been admissible at trial as "other crimes" evidence, pursuant to Rule 404(b) of the Federal

Rules of Evidence, for the purpose of establishing identity or *modus operandi*. *See Moore*, 115 F.3d at 1353-54 & n.3 (discussing contours of "other crime" evidence under Rule 404(b), including *modus operandi*).[3]

A decision to admit other crimes evidence essentially combines the requirements of Rules 404(b) and 403 into the following four-pronged test: Evidence of "other crimes" must (1) be directed toward establishing something other than the defendant's propensity to commit the charged offense (here, the identity and *modus operandi* of the perpetrator), (2) show sufficient similarities in time and manner to establish relevance to the charged conduct, (3) be sufficient to support a jury finding that the defendant committed the similar act, and (4) have probative value that is not substantially outweighed by the danger of prejudice to the criminal defendant. *Id*. at 1354; *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996); *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996); *United States v. Mounts*, 35 F.3d 1208, 1214 (7th Cir. 1994). In addition, *modus operandi* evidence must "bear a singular strong resemblance to the pattern of the offense charged." *Moore*, 115 F.3d at 1354-55 (quotations omitted).

The facts of this case amply meet this criterion. Common threads in most, if not all, of the robberies included (1) the donning of thick, dark-framed glasses; (2) the wearing of a beige, three-quarter length down coat; (3) the ruse of asking seemingly innocuous customer questions before

---

[3] Rule 404(b) states that evidence of other crimes, wrongs, or acts is generally not admissible, though it also provides for several exceptions, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Moore*, 115 F.3d at 1353 n.4 (quoting Fed. R. Evid. 404(b)). This court has generally construed *modus operandi* proof as part of the "identity" exception. *Id*. at 1354 n.3; *United States v. Beasley*, 809 F.2d 1273, 1277 (7th Cir. 1987).

and during the robberies; (4) the use of a black and grey handgun placed calmly on the teller counter; (5) the commission of multiple crimes within a period of only a few months; and (6) similar descriptions that typically described the assailant as a medium to dark-complected African-American male, approximately 5'10" to 6'0" tall, with a thin build and a narrow face. Moreover, the evidence of each individual crime was both substantial and consistent, with victim tellers from all five robberies positively identifying Rollins as the assailant. It is well settled that "prejudice requiring severance is not shown if evidence on the severed count[s] would be admissible in the trial of the remaining counts." *United States v. Rogers*, 475 F.2d 821, 828 (7th Cir. 1973); *accord Quilling*, 261 F.3d at 715; *United States v. Windom*, 19 F.3d 1190, 1198 (7th Cir. 1994). Because evidence of the four Chicago robberies would have been mutually admissible if the counts had been tried separately, the district court did not abuse its discretion by denying the motion to sever.

B.

The next issue presented on appeal is whether the district court abused its discretion when it admitted "other crimes" evidence of the fifth robbery in Independence, Missouri. The resolution of this issue closely follows our Rule 404(b) analysis of the severance motion. In fact, the Missouri robbery passes the four-pronged test for other crimes evidence with flying colors.

First, the evidence from the Missouri robbery was used to establish the *identity* of the person who robbed the Chicago banks, rather than a propensity by Rollins to rob banks. Second, the Missouri robbery and the Chicago robberies were related in time (eleven days separated the fourth Chicago robbery from the Missouri caper) and had common idiosyncratic features, such as thick, dark-framed

glasses, the asking of mundane customer questions while the robbery was in progress and a heightened awareness of security measures that were encountered in the four previous bank robberies. Third, Rollins' guilty plea in the Missouri robbery is dispositive evidence that he actually committed that act. And Fourth, the evidence of the Missouri robbery was highly probative of Rollins' guilt, outweighing any prejudicial aspect.

Further, the risk of prejudice was substantially reduced by limiting instructions given by the district court, which directed the jury to limit their consideration of this evidence to the issue of identity. *See United States v. Brooks*, 125 F.3d 484, 500 (7th Cir. 1997) (holding that adequate limiting instructions were sufficient to cure any potential prejudice from admission of Rule 404(b) evidence); *Moore*, 115 F.3d at 1355 (same); *see also United States v. Jones*, 248 F.3d 671, 676 (7th Cir. 2001) (holding that reviewing court will assume that jury followed a Rule 404(b) limiting instruction). The district court did not abuse its discretion when it admitted other crimes evidence from the Missouri robbery.

C.

Rollins' final issue on appeal is the novel claim that the federal bank robbery statute, 18 U.S.C. § 2113(a), was effectively repealed in 1978, two years after Congress passed the National Emergency Act, Public Law 94-412, 90 Stat. 1255 (1976). The thrust of Rollins' argument is that when President Franklin Roosevelt declared a national emergency on March 4, 1933, he suspended constitutional limitations on the expansion of federal power. The following year, Congress passed the federal bank robbery statute, which effectively displaced state law provisions governing the same underlying offense. Rollins maintains that Section 101 of the National Emergency Act

officially erased the remaining vestiges of executive power that arose from prior declarations of national emergencies. *See* 50 U.S.C. § 1601(a) ("All powers and authorities possessed by the President, any other officer or employee of the Federal Government, or any executive agency, . . . as a result of the existence of any declaration of national emergency in effect on the date of enactment of this Act are terminated two years from the date of such enactment."). Rollins argues that the federal bank robbery statute was passed in a sort of constitutional vacuum created by President Roosevelt's order declaring an emergency. Since the National Emergency Act terminated the emergency and effectively filled this vacuum, Rollins maintains that federal jurisdiction for the crime of bank robbery no longer exists.

In response to Rollins' call for a revolution in notions of federal jurisdiction, the government points out that there is nothing about the original 1934 bank robbery legislation indicating that the 1933 national emergency declaration was the source of congressional authority to pass the bank robbery statute, or that the bank robbery statute would expire upon termination of the national emergency. *See* Pub. L. No. 73-235, ch. 304, §§ 1, 2, 3, 48 Stat. 783 (1934). Further, no court has ever held that jurisdiction for the federal bank robbery statute relies upon a declaration of national emergency. In fact, no court has ever addressed the issue. The government argues that Congress enacted 50 U.S.C. § 1601 as a limitation on executive branch authority arising from past national emergencies rather than, among other things, a curtailment of the ability of federal district courts to adjudicate criminal statutes. *Cf.* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.").

Suffice to say, we think the government has the better of the argument. However, it is worth noting that the con-

stitutional authority for making bank robbery a federal crime is not in doubt. It is firmly rooted in the Commerce Clause, U.S. Const., art. I, § 8, cl. 3. *See United States v. Watts*, 256 F.3d 630, 634 (7th Cir. 2001) (holding that "FDIC-insured financial institutions are instrumentalities and channels of interstate commerce and their protection from robbery is well within Congress's Commerce Clause power" (citing *United States v. Harris*, 108 F.3d 1107, 1109 (9th Cir. 1997))).

### III.

In summary, the district court did not abuse its discretion when it denied Rollins' motion to sever or when it admitted other crimes evidence related to a fifth bank robbery in Independence, Missouri. The district court also correctly denied Rollins' motion to dismiss the bank robbery counts for lack of federal jurisdiction. Therefore, the judgment of the district court must be AFFIRMED.

A true Copy:

      Teste:

                              _____

                              *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*