In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-4195

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RODNEY HENDERSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 1135—**Matthew F. Kennelly**, *Judge.*

ARGUED MAY 15, 2003—DECIDED JULY 25, 2003

Before BAUER, COFFEY, and DIANE P. WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* On December 19, 2001, a grand jury returned an indictment charging Defendant Rodney Henderson with one count of distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1) for activities dating back to August 1998. Prior to trial, Henderson moved to dismiss the indictment on the basis of prejudicial pre-indictment delay, but the district court denied that motion. Henderson was convicted after a three-day jury trial, and his subsequent motions for a new trial and a judgment of acquittal were also denied. The court then sentenced Henderson to 151 months' imprisonment and five years of supervised release. Henderson appeals the prosecution's attempt to

bolster the credibility of a government informant at trial as well as the denial of his motion to dismiss for pre-indictment delay. We affirm.

## BACKGROUND

In March of 1998, Willie McPhaul, a cocaine dealer, began providing the government with information on local drug dealers and arranging undercover buys. McPhaul's first deal with Henderson occurred when McPhaul telephoned Henderson's place of employment, the What's Up Barbershop in North Chicago, Illinois, on August 27, 1998, to arrange for the purchase of four and one-half ounces of crack cocaine. The conversation, which was recorded by the government, began with McPhaul asking Henderson how much he would charge for "four and a half," referring to the four and one-half ounce quantity McPhaul sought. Henderson replied by asking, "Oh, hard?" (meaning crack cocaine). McPhaul replied, "Yeah," and Henderson informed him the cost would be "25," meaning $2,500.00. McPhaul agreed to the deal and told Henderson that they would meet later that day or the next.

McPhaul telephoned Henderson the following day, August 28, 1998, to arrange a meeting time and place. Henderson instructed McPhaul to meet him at the What's Up Barbershop at one o'clock that afternoon. Prior to the meeting, FBI agents thoroughly searched McPhaul's truck, finding no narcotics, and strapped a body wire to McPhaul to record the deal. McPhaul then drove to Henderson's barbershop, entered the building (at which time surveilling agents could not see McPhaul), used the restroom, spoke with a few unidentified patrons, and then exited the barbershop with Henderson. The two men proceeded to McPhaul's truck, wherein Henderson asked McPhaul if he had the money to pay for the drugs. McPhaul replied that he did, and Henderson responded that he would be right back.

Henderson then exited McPhaul's truck and entered a nearby residential building. He returned a short time later and reentered McPhaul's truck, placing a plastic bag containing approximately 122.3 grams of crack cocaine in the glove compartment. McPhaul paid Henderson, who exited the truck and returned to the barbershop, and then McPhaul drove to a pre-arranged location to meet with FBI agents. Agents again searched McPhaul's truck and located the drugs Henderson left in the glove compartment.

Agents did not immediately arrest Henderson because the government planned to use McPhaul to conduct investigations into other dealers and his status as an informant had not been made public. Over the next three years, McPhaul arranged undercover drug deals with four other crack dealers in Illinois and Wisconsin, a Mexican cocaine supplier, and an ecstasy dealer in North Carolina. In the summer of 2001, the government began plea negotiations with McPhaul and indicted him in November 2001.

On December 19, 2001, Henderson was indicted. Henderson sought to dismiss the indictment on the grounds that the delay of slightly over three years prejudiced his ability to present an alibi or identity defense because the barbershop had since closed, two former employees could not recall anything about the day in question, and a possible third witness (the owner's daughter) had died. The district court denied the motion, finding that the claim of prejudice was speculative because there was no indication that any of the witnesses or evidence to which Henderson pointed would have actually been helpful to his defense. The court also found that the government had not acted with bad faith or recklessness.

Prior to trial, the government sought to prohibit Henderson from attacking McPhaul's credibility, provided the government did not call McPhaul as a witness. Henderson argued that McPhaul's credibility was relevant because

McPhaul had the motive and opportunity to frame Henderson (in order to curry favor with the government and help his own plea deal) and that he would attack McPhaul's credibility on those grounds. The district court ruled that Henderson could introduce evidence regarding McPhaul's motive and opportunity to plant the drugs and frame Henderson. Specifically, the court decided that Henderson could elicit evidence regarding the existence of McPhaul's drug sources prior to his cooperation with the government, that McPhaul engaged in other drug transactions while cooperating with the government,[1] that McPhaul was not in the FBI agents' view the entire time he was inside the What's Up Barbershop, and that McPhaul was attempting to work out a plea deal with the government, which gave him a motive to plant the drugs.

The government responded by arguing that *United States v. Lindemann*, 85 F.3d 1232 (7th Cir. 1996), permitted the introduction of evidence that McPhaul had cooperated in cases against approximately twenty other individuals, resulting in guilty pleas in three of the six cases that had been resolved at that time. The district court agreed with the government's position and permitted the government to question one of the FBI agents on re-direct examination about McPhaul's involvement in other cases. Following that brief testimony, the court issued the following instruction to the jury:

> "You just heard some testimony in which there was a reference made to guilty pleas that were made by other people in other cases. The fact that other people may

---

[1] Apparently, McPhaul was arrested for selling drugs while assisting the government in other cases. Henderson sought to introduce this evidence in order to show that McPhaul had other suppliers from whom he could obtain drugs outside of the government's knowledge in order to frame Henderson.

> have pled guilty in other cases cannot be considered by you as any evidence of the guilt of the defendant in this case."

Henderson renewed his motion to dismiss based on pre-indictment delay following the close of the government's case, which was again denied. After the jury returned a guilty verdict, Henderson moved for a new trial, arguing that the government improperly bolstered McPhaul's credibility as a non-testifying witness. The district court denied this motion, relying on *United States v. Lindemann*, and subsequently sentenced Henderson to 151 months' imprisonment and five years of supervised release. This appeal ensued.

## ANALYSIS

### A. Bolster of McPhaul's Credibility

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Bonner*, 302 F.3d 776, 780 (7th Cir. 2002); *United States v. Lindemann*, 85 F.3d 1232, 1242 (7th Cir. 1996). We employ such deference because the district court is in the best position to judge the admissibility of evidence due to the court's familiarity with the case as a whole. *United States v. Curry*, 79 F.3d 1489, 1495 (7th Cir. 1996). Consequently, an abuse of discretion occurs only when no reasonable person could take the district court's view. *United States v. Akinrinade*, 61 F.3d 1279, 1282 (7th Cir. 1995).

In *United States v. Lindemann*, this Court discussed at length the difference between improperly bolstering a witness's credibility and rehabilitating that witness following an attack on the witness's bias. *Lindemann*, 85 F.3d at 1242-44. We noted that bolstering consists of enhancing a witness's credibility before that credibility is attacked. *Id.* at 1242. When the witness has been attacked, however, his

credibility may be restored through admissible rehabilitation evidence. *Id.* We further held that an allegation by the defendant that a witness falsely implicated him amounts to an attack on the witness's bias. *Id.* at 1243. Such an attack is an attempt to demonstrate that the witness was motivated by self-interest, an obvious form of bias, rather than the truth. *Id.*

When rehabilitating a witness in such a situation, it is permissible to use extrinsic evidence because bias is not a collateral issue. *United States v. Scott*, 267 F.3d 729, 735 (7th Cir. 2001); *Lindemann*, 85 F.3d at 1243. Accordingly, the admissibility of rehabilitation evidence following an attack on the witness's bias is controlled solely by considerations of relevance. Rule 401 of the Federal Rules of Evidence defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401 (2003).

Relevant evidence is admissible under Rule 402, but admissibility can be limited by Rule 403. FED. R. EVID. 402, 403 (2003). The parameters of Rule 403 preclude the admission of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.

In this case, Henderson first argues that McPhaul's credibility was not attacked because McPhaul did not testify at trial and the government solicited evidence of his prior deals from one of the FBI agents. *Lindemann* deals squarely with the issue of whether McPhaul's credibility was attacked by Henderson and, though McPhaul did not testify at trial, we find no reason to create an exception to *Lindemann*. Henderson's argument that McPhaul framed him

was an attack on McPhaul's credibility and the government was entitled to introduce admissible rehabilitation evidence.

That result leaves us with the question of whether evidence of McPhaul's cooperation was relevant and not unfairly prejudicial to Henderson. On this issue, Henderson argues that evidence of McPhaul's cooperation in other cases was not relevant because McPhaul did not yet have other "bargaining chips" with which to negotiate a lesser sentence, thereby giving McPhaul a greater motive to frame him. We do not agree. McPhaul's cooperation in other cases made it less probable that he framed Henderson because Henderson was the first of several "bargaining chips" with which McPhaul could work. *Lindemann*, 85 F.3d at 1243. The fact that Henderson was McPhaul's first deal does not remove this case from the *Lindemann* rationale. By the time he arranged the deal with Henderson, McPhaul had given other names to the government and eventually assisted with investigations of those people. McPhaul knew that he would have multiple bargaining chips, beginning with Henderson, and the evidence of his further cooperation casts doubt on Henderson's argument that McPhaul had a greater motive to falsely implicate Henderson.

Further, Henderson's argument speaks only to the proper weight to be given the evidence, not its admissibility. As noted above, Rule 401 defines relevant evidence as that which makes an assertion *more probable* or less probable. We do not find error in the district court's decision that this evidence was relevant, nor did the district court err in finding that the probative value of evidence of McPhaul's cooperation with other government cases was not outweighed by the danger of unfair prejudice. Without this evidence, the jury might have believed that McPhaul's plea deal rested solely on the Henderson case, thereby making a motive to frame Henderson all the more reasonable. It was not unduly prejudicial to Henderson to present the jury

with an accurate understanding of the situation and allow the jury to conclude which argument was more plausible.

Finally, immediately following the admission of this evidence, the district court appropriately instructed the jury not to infer Henderson's guilt from evidence of McPhaul's cooperation in other cases that resulted in guilty pleas. *Lindemann*, 85 F.3d at 1243-44.

### B.  Pre-Indictment Delay

Henderson next argues that the district court erred by not dismissing his indictment because the prosecution severely prejudiced his defense by waiting three years to charge him. In the interim, Henderson contends, witnesses' memories faded, a potential witness died, and employment records were destroyed, any of which might have supported his defense. The prosecution counters that Henderson was not prejudiced in the presentation of his defense and that the delay occurred because McPhaul's cooperation was not complete following his drug deal with Henderson and the government did not want to expose his informant status.

Again, we review the district court's decision not to dismiss for pre-indictment delay for an abuse of discretion. *United States v. McMutuary*, 217 F.3d 477, 481 (7th Cir. 2000). We first note that the statute of limitations for a particular crime generally serves as a safeguard for defendants against unreasonable prosecutorial delay. *Id.* So long as the indictment is sought within the applicable time frame, and notwithstanding the possible loss of evidence or faded memories, the defendant will normally be able to defend himself adequately. *United States v. Baker*, 40 F.3d 154, 157 (7th Cir. 1994). The applicable statute of limitations was five years. 18 U.S.C. § 3282 (2003). The drug deal between McPhaul and Henderson occurred on August 27-28, 1998, and the indictment was returned on December 19, 2001, well within the statute of limitations.

Yet, the statute of limitations is not the only safeguard afforded a defendant. The defendant may establish a due process violation if the prosecutorial delay caused actual and substantial prejudice to the defendant's right to a fair trial. *McMutuary*, 217 F.3d at 481-82. A defendant must first show more than mere speculative harm but instead must establish prejudice with facts that are specific, concrete, and supported by evidence. *Id.* at 482. If a defendant makes the proper showing, the burden shifts to the government to demonstrate that the "'purpose of the delay was not to gain a tactical advantage over the defendant or for some other impermissible reason.'" *Id.* The government's reasons are then balanced against the prejudice to a defendant to determine whether a due process violation occurred. *United States v. Canoy*, 38 F.3d 893, 902 (7th Cir. 1994).

We have previously held that the death of a potential witness alone is insufficient to establish actual and substantial prejudice. *United States v. Koller*, 956 F.2d 1408, 1414 (7th Cir. 1992); *United States v. Valona*, 834 F.2d 1334, 1338-39 (7th Cir. 1987); *United States v. Solomon*, 688 F.2d 1171, 1179 (7th Cir. 1982). The same holds true with regard to witnesses' memories that have faded, *United States v. The Honorable Judges of the Circuit Court of Cook County*, 138 F.3d 302, 310 (7th Cir. 1998) ("It is not enough simply to speculate . . . that witnesses' memories might have faded because of the passage of time."), and the loss of possible physical evidence, such as employment records, *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1998); *Canoy*, 38 F.3d at 902-03.

Henderson's argument that his defense was prejudiced is based on these facts: Following his indictment, he interviewed two former barbershop employees who remembered him working there but did not remember anything about August 28, 1998. What a clear recollection might have uncovered to aid Henderson is unsaid. Likewise, the death

of a potential, third witness (the owner's daughter), without some evidence of what she might have supplied to aid Henderson, does not meet the requirement to show prejudice.

Finally, Henderson argues that his defense was hampered because the owner had destroyed all employment records after closing the shop well before Henderson was indicted. We fail to see how the possible existence of business records would have supported Henderson's particular defense. When McPhaul called Henderson on August 28, 1998, Henderson chose the time and location for their meeting. McPhaul did not know prior to their telephone conversation that Henderson would chose to complete the drug deal at his place of employment. As a result, it is pure speculation to conclude that McPhaul could have planted the drugs prior to that day and that any barbershop witnesses or business records would have placed him in the store for that supposed purpose.[2] FBI agents kept McPhaul under surveillance (except for his brief detour into the barbershop) making it highly unlikely for him to have obtained the drugs from anyone other than Henderson.

Having determined that Henderson failed to establish anything beyond speculation, we note briefly that the government demonstrated that the delay was not used to gain a tactical advantage over Henderson or for some other impermissible reason. To the contrary, the government established that the delay was occasioned by the timing of McPhaul's cooperation, in that he had not yet completed assisting the government with other investigations. Quite

---

[2] Henderson believes an appointment log or transaction receipt would have shown McPhaul was in the barbershop prior to August 28, 1998, at which time McPhaul might have foreseen that Henderson would choose to complete the deal at the barbershop and stashed the drugs inside so that he could retrieve them in order to frame Henderson.

reasonably, the government did not want to expose his status as an informant and sacrifice those investigations. Henderson failed to demonstrate that the district court abused its discretion by not dismissing the indictment for prosecutorial delay.

Accordingly, the decision of the district court is AFFIRMED.


A true Copy:

      Teste:

                         _____

                         *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*