# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3589

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES F. HANDLIN,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 CR 30079—**Jeanne E. Scott**, *Judge.*

———————

ARGUED FEBRUARY 9, 2004—DECIDED MAY 3, 2004

———————

Before BAUER, MANION, and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Illiopolis, Illinois, a small town with a population of 916, was the site of a combustible criminal conspiracy that raged for a period of years. Between the years of 1991 and 1997, the area in and around this small town saw eight successful acts of arson and one failed attempt. It is a wonder that there was anything left standing in the area when the ashes finally settled. The story is as follows:

Late in 1990 or January of 1991, Defendant James F. Handlin and Jack Skaggs purchased on a contract for

deed basis what would be called J&J's Company Store from Lawrence "Joe" Hamm. Shortly after gaining possession of the store, Handlin and Skaggs increased the insurance coverage on their new store. Around this same time, Hamm purchased another convenience store/gas station and began operating it under the name Joe's Company Store. The opening of Joe's Company Store was bad news to its competition, Johnson's Red Fox Grocery, which was located across the street from Joe's.

Johnson's Red Fox Grocery erupted in flames on February first or second, 1991. The fire was started by John W. "Billy" Rogers when he poured a quantity of gasoline down a roof vent. The gasoline was then followed by a lit road flare. Johnson's Red Fox was leveled by the fire and the insurance company paid the owners approximately $800,000. Rogers received $2,500 from Hamm for the arson job.

On February 16, after the insurance had been raised, J&J's was destroyed by fire. While separate investigations by the State Fire Marshall's Office and the insurance company were unable to determine the cause of the fire, Rogers' testimony at the trial, which would commence much later, showed that Rogers and Danny Dennison were paid $500 to burn the store. The insurance company paid out a total of $51,000. Of these funds, Hamm received $42,000 as a result of a provision in the contract for sale, Handlin's attorney received $2,500, and the balance was used for "clean up."

After putting his direct competitor out of business, on August 15, 1991, Hamm hired Rogers to burn down Hamm's own business, Joe's Company Store. Hamm supplied Rogers with a key so as to facilitate the arson. Unfortunately for Hamm and Rogers, the fire did not completely destroy the building. It turned out that the flare used to ignite the blaze caused a water pipe to rupture which extinguished the

flames. Hamm made an insurance claim of $42,936 but was only paid $28,529. Because the building was not totally destroyed, Hamm refused to pay Rogers for his work.

After this failed arson attempt, Rogers complained to Handlin about a shortage of cash. Handlin suggested that Rogers use the key that Hamm had given him to steal cigarettes from Joe's Company Store. Apparently, Rogers was in the midst of a string of bad luck; the theft failed and he was arrested. As might be expected, Hamm tried to have the charges dropped.

Business must have been good for a while because there was not another fire for approximately three years, but on June 5, 1994, Rogers was paid $500-$600 by Hamm to burn down Granny's Pub and Grub, another competitor of Joe's Company Store. Although he failed to level Granny's Pub and Grub, he did succeed in causing extensive fire damage to the interior of the building. Granny's insurance company paid out approximately $37,000. There was then another break in the setting of fires.

In 1996, Hamm and Handlin approached Rogers with a plan to prevent Green Oil Gas Station from competing with Joe's Company Store. Located across the street from Joe's Company Store, Green Oil had been newly remodeled with fiberglass-lined gas tanks, a new canopy, concrete, lighting and a convenience store. Hamm and Handlin's plan was to provide Rogers with a cordless drill, a drill bit, and two steel rods to extend the drill bit so that he could puncture the underground gas tanks. Rogers completed the plan and was paid $500 for his work after Handlin told Hamm of their success. Their success, however, was short-lived. The owner of the Green Oil Gas Station repaired the tanks and stayed in business.

Having failed to eliminate his competition by more subtle means, Hamm reverted to the tried-and-true method of arson. Rogers was paid $1000 to burn down Green Oil and

he did so in the fall of 1996. The loss was valued at nearly $175,000.

Later, in October 1996, Handlin approached two of his employees, Chad Bennett and James Clapp, and asked if they would be interested in setting fire to Habits and Vices Tavern. This bar was located about one block from Joe's Company Store. They did not give an answer immediately and when they did agree, Handlin told them it was too late. Rogers had beaten them to the punch.

At the same time that Handlin solicited Bennett and Clapp to perform the arson, Hamm talked to Rogers. Rogers agreed to set fire to Habits and Vices Tavern for $1000 and on October 1, 1996 he did so. Habits and Vices Tavern's insurer paid out $160,000 as a result of the fire.

The conspirators then hatched yet another scheme to defraud their own insurance companies. In the fall of 1996, Handlin and Hamm approached Rogers with a plan to stage a vehicular accident. Rogers was to steal a rental truck from a Decatur business and ram Handlin's and Hamm's unoccupied and parked vans. Rogers refused to participate; apparently, the prospect of stealing a U-Haul during the daylight hours was too much risk for Rogers. Undaunted, Handlin went to the second-stringers, Clapp and Bennett, and discussed the same scheme. Clapp and Bennett agreed to participate.

In the evening hours of December 6, 1996, Clapp and Bennett stole a U-Haul rental truck from a Decatur business and drove it to a country road near Illiopolis. The plan was simple in its execution. Handlin's van was parked just short of a stop sign and Hamm's van was parked directly behind Handlin's. When Handlin gave the signal, Bennett accelerated to 55 m.p.h. and rammed the rearend of Hamm's van. Handlin and Hamm called 911 to report the accident as Clapp and Bennett made their getaway. The 911 report was not the only one that Hamm and Handlin

made. Hamm claimed that he was hit while on a business errand for which his insurance company paid him approximately $470,000. Handlin claimed that he suffered injuries as a result of the accident and received $40,000 from his insurance company. Clapp and Bennett were paid $1000 by Handlin and promised that more would be paid when the insurance claims were settled.

Around the same time that the conspirators were planning and executing the staged vehicle accident, they were also planning to burn down Joe's Company Store and Christine's Lounge, another establishment located across the street from Joe's Company Store (a particularly dangerous part of town it seems). Clapp, Bennett, Hamm, and Handlin met at a restaurant to discuss the plan.

A few days prior to setting the fires at Joe's Company Store and Christine's Lounge, Handlin, Clapp, and Bennett removed goods and furniture from Joe's. On the night of December 12, 1996, Bennett and Clap set fire to Joe's while Rogers attempted to ignite a blaze in Christine's Lounge. The idea behind setting fire to both buildings was to force the firefighters to choose which building they would save. Hamm assumed that the emergency response teams would attempt to extinguish the fire at Christine's Lounge first because there were antique cars inside. Rogers' attempt to ignite a blaze within Christine's was foiled this time due to a damp flare. Nevertheless, Joe's Company Store was so extensively damaged that Hamm's insurance company paid the policy limits in claims. Handlin paid Clapp and Bennett for their parts in the arson.

To "take some of the heat off" of Illiopolis, Handlin and Hamm hired Clapp and Bennett to set fire to the Corn Crib Tavern in Latham, Illinois, about fourteen miles from Illiopolis. After the tavern was completely destroyed, Handlin paid Clapp and Bennett $1000 for the job. When Clapp and Bennett complained that they had been promised

more, Handlin told them to take it up with Hamm.

Shortly after the conspirators had reduced the Corn Crib Tavern to ashes, they began to plan another scheme to steal two truckloads of cigarettes from W.F. Brockman and Company, a wholesale distributer of tobacco, candy, and paper goods. Handlin approached Bennett and Clapp with the plan. Clapp refused, but Bennett agreed to participate. Hamm then approached Rogers who also agreed to participate in the theft. Handlin made two trips, one with Bennett, the other with Hamm and Rogers, to Brockman's premises in order to case the area.

In the early morning hours of February 1997, Handlin, Bennett, and Rogers met near Brockman and Company. Handlin dropped Bennett and Rogers off within walking distance of the Brockman lot and then parked across the street as a lookout. Rogers and Bennett took longer than anticipated to hot-wire one truck. As a result, the plan to steal two trucks was ditched. Calling Handlin on their radio, Bennett and Rogers made sure that the front of the Brockman lot was clear. Hearing that it was, they attempted their getaway. Unfortunately (or fortunately, depending on the perspective), the act of hot-wiring loosened the steering wheel to such a point that it fell off when Rogers drove over a set of railroad tracks. Rogers lost control of the truck and ended up crashing into a ditch. Bennett and Rogers ran back to Bennett's truck, which was parked nearby, and radioed Handlin with the news. The three drove back to Illiopolis empty handed. Empty handed is how Rogers and Bennett left this job because Hamm refused to pay them for their botched work.

The authorities must have noticed the fact that the area in and around Illiopolis was slowly being reduced to ashes and in April 2001, the government convinced Bennett to cooperate with them. Wearing a wire, Bennett met with

Handlin.

Bennett told Handlin that he had been arrested for arson and explained that the government tried to induce his co-operation by presenting evidence of various arsons and the staged accident. He also told Handlin that Clapp had made a statement to the government about the Corn Crib Tavern fire and that the statement included facts that could only be known to the conspirators; i.e., that Handlin was responsible for soliciting Clapp and Bennett and that he would pay the torches, not Hamm. Bennett then reminded Handlin about his promise to supply a lawyer should the need arise. Handlin, among other inculpatory statements, said, "You see my [expletive deleted] business. I'm right in the middle of this [expletive deleted]!" When Bennett wondered why the government only asked about Handlin and Hamm, Handlin said, "Well, no, most likely they're after me and Joe [Hamm]."

On July 11, 2001, Handlin, Hamm, Bennett, and Clapp were indicted. Handlin was charged with a total of eight counts, including conspiracy to defraud the United States, 18 U.S.C. § 371, use of explosives in the commission of a felony, 18 U.S.C. § 844(h), and mail fraud, 18 U.S.C. 1341. Handlin filed various pretrial motions including motions to sever his trial from that of his co-conspirators, to sever the "various conspiracy counts," to suppress the use of his grand jury testimony, and to exclude evidence of other bad acts. The district court granted the motion to sever the trial from the other defendants but did not rule on the motion to sever the various conspiracy counts. The court further allowed the use of the grand jury testimony for impeachment purposes only. The motion to suppress was granted in part but the court allowed evidence relating to the drilling of Green Oil's gas tanks and the attempted thefts of cigarettes.

At the close of a six day trial, Defendant Handlin was

found guilty of all the charges against him. His motions for a new trial and judgment of acquittal were denied by a written order. Handlin was sentenced to 180 months in prison, three years of supervised release, and ordered to pay $655,639.06 in restitution and $800 in special assessments. Defendant Handlin appealed.

## DISCUSSION

*Fatal Variance*

Handlin first argues that the evidence showed multiple conspiracies as opposed to the one charged in the indictment. Although there is some question as to whether the defendant forfeited this claim, a properly preserved claim of fatal variance will be treated as an attack on the sufficiency of the evidence. *United States v. Williams*, 272 F.3d 845, 863 (7th Cir. 2001). Even if the evidence at trial shows the existence of multiple conspiracies, a fatal variance will not be found if a reasonable juror could have found beyond a reasonable doubt that the defendant was part of the single, charged conspiracy. *Id.* We view the evidence in the light most favorable to the government. *Id.* Furthermore, Handlin must show that the variance worked to prejudice his defense. *Id.*

The defendant was charged with conspiracy to commit arson and mail fraud. In his brief to this court he rightly points out, "[t]o join a conspiracy, then, is to join an agreement, rather than a group." *Citing United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). An agreement need not be explicit; a tacit agreement may support a conspiracy conviction. *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994). The agreement may be proved by circumstantial evidence. *Id.* Such evidence may be aimed at showing that the co-conspirators embraced the criminal objective of the conspiracy, *United States v. Severson*, 3 F.3d 1005, 1010 (7th Cir. 1993), the conspiracy continued onward

towards its common goal, *United States v. Mojica*, 185 F.3d 780, 787 (7th Cir. 1999), there were prolonged and/or cooperative relationships, *United States v. Collins*, 966 F.2d 1214, 1221-24 (7th Cir. 1992); *Severson*, 3 F.3d at 1010, or the various transactions followed a similar sequence of events, *Severson*, 3 F.3d at 1010. Elements of each and every one of these factors can be found in this conspiracy.

As the number of individual incidents increased, so too did the evidence pointing to a single conspiracy. The evidence shows a conspiracy designed to generate income to the individuals involved by means of arson and mail fraud. Every single incident served to further the scheme, be it by generating money to the conspirators, wiping out competition, or covering up the existence and/or actions of the conspiracy.[1] When viewed in light of this more specific purpose, it is clear that the co-conspirators embraced the common goal of the conspiracy and continued towards that goal over a period of years.

Although all of the individual incidents are similar, they are not identical. However, the level of trust, cooperation, and delineation of duties among the various participants overcomes any doubt that this was anything other than a single, broad conspiracy. *See Severson*, 3 F.3d at 1010; *Collins*, 966 F.2d at 1221-24. The conspiracy lasted for a number of years with a clear pattern of "doing business," and a small cast of characters. Either Handlin or Hamm would hire someone to do the more risky work. The hired individual would then be paid after the work was completed. In fact, by 1996 this process had solidified into Handlin hiring Rogers or Bennett and/or Clapp to carry out

---

[1] We note however, that Roger's attempt to steal cigarettes from Joe's Company Store falls outside of the goal of the conspiracy. Nevertheless, it was relevant to show Handlin's knowledge of and participation in the conspiracy.

the job. When the job was finished, Handlin would pay Rogers, Bennett, and/or Clapp. The evidence also shows that at least some of the fires were started in a similar manner—with a flare. This and other evidence shows, among other things, that the co-conspirators trusted each other enough to rely upon the promises made to each other; e.g., to pay after work was completed or to supply an attorney if someone was to get caught. The long-term coordination is illustrated by the repeated use of the same individuals in the conspiracy over a number of years. Finally, there is a clear division of labor which is shown by the fact that Hamm and Handlin acted as managers or foremen, while Rogers, Bennett, and Clap act as employees of those managers. Reviewing the evidence in the light most favorable to the government, as we must, we find that a reasonable juror could well have found the existence of a single conspiracy beyond a reasonable doubt.

*Co-Conspirator Statements*

Handlin next complains about co-conspirator statements that were introduced against him at trial. Specifically, he takes issue with "those statements attributed to the co-defendant Hamm regarding the 1991 arsons, the 1994 arson, and the October, 1996 arsons [which] could never be admitted against Handlin because he was not a member of those conspiracies." We review a district court's evidentiary rulings for abuse of discretion. *United States v. Henderson*, 337 F.3d 914, 918 (7th Cir. 2003). Federal Rule of Evidence 801(d)(2)(E) defines nonhearsay as "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." We note that it is irrelevant when the defendant joined the conspiracy, so long as he joined it at some point. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). Since there is no serious attempt to argue that Handlin was not part of the conspiracy at some point,

his argument depends upon whether there were multiple conspiracies, and not a single, overarching conspiracy. Because we rejected his fatal variance argument, we also reject this argument. The co-conspirator statements were nonhearsay.

*Severance of Counts*

Prior to trial, Handlin filed a Motion to Sever Counts and Defendants.[2] Although there is also some question as to whether he forfeited this claim, we will address it on the merits.

Federal Rule of Criminal Procedure 8(a) allows joinder of multiple counts if they are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." This court reviews the district court's denial of a motion to sever counts de novo. *United States v. Quilling*, 261 F.3d 707, 713-14 (7th Cir. 2001). Handlin must show that the joinder created actual prejudice that served to deprive him of a fair trial. *United States v. Rollins*, 301 F.3d 511, 519 (7th Cir. 2002). Furthermore, it is clear that "prejudice requiring severance is not shown if evidence on the severed counts would be admissible in the trial of the remaining counts." *Id.* at 519 (*quoting United States v. Rogers*, 475 F.2d 821, 828 (7th Cir. 1973)).

There is no reason to sever the conspiracy count from the counts related to the Joe's Company Store fire or those related to the staged accident. The fire at Joe's and the

---

[2] It is Handlin's position that there should have been three separate trials; one for the conspiracy, one for the staged accident, and one for the conduct related to the 1996 fire at Joe's Company Store.

staged accident involving a stolen U-Haul were listed as overt acts in the conspiracy count of the indictment. We have previously found that the evidence adduced at trial supported a finding of *one* conspiracy of which Handlin was a part. *See* discussion *supra* "Fatal Variance." Therefore, as the district court held, the evidence proving the substantive counts of which Handlin complains could have been introduced as evidence of the conspiracy charge in any event. Clearly, the failure to sever the counts did not serve to unfairly prejudice the defendant. *See Rollins*, 301 F.3d at 519.

*Uncharged Bad Acts*

Prior to trial, Handlin joined in Hamm's motion *in limine* which sought to exclude evidence of uncharged "bad acts." The government responded that the acts were intricately related to the charged offenses. After the court's ruling, the government was allowed to introduce evidence on two of those bad acts; specifically, the 1991 cigarette theft from Joe's Company Store and the 1997 theft of cigarettes from Brockman and Company. Handlin claims that this was error.

It should be noted that there was some confusion as to when the motion was decided. The facts of the two cigarette thefts were, for some reason, presented in the motion *in limine* as one theft with factual components of each of the two actual thefts. The government asserted that it would present evidence that Hamm submitted false insurance claims as a result of the cigarette thefts. This assertion turned out to be wrong in that there was no evidence that Hamm submitted an insurance claim for the cigarette thefts. Nevertheless, the trial court affirmed its pre-trial finding in its decision denying the defendant's motion for a new trial, stating that the incidents were probative of the relationships among the co-conspirators.

The judge wrote:

> In Defendant Handlin's trial, Rogers testified that Handlin told him to steal cigarettes from Hamm's business. That testimony indicated that Handlin told Rogers to do this since Hamm had not paid Rogers in full for the Joe's Company Store arson in 1991. It showed the relationship of the conspirators and was intricately related to the evidence of the arson of Joe's Company Store. Additionally, Bennett and Rogers testified about participation in an attempted cigarette theft from Brockman's. The government failed to present evidence, however, that Hamm received any insurance settlement as a result of these incidents. The court finds that this evidence is still probative of the relationship among the alleged co-conspirators. *United States v. Kellum*, 42 F.3d 1087, 1093 (7th Cir. 1994). The testimony concerning the theft attempt at Brockman's also demonstrated the relationship between the alleged co-conspirators. It clearly showed the pecking order within the conspiracy; Hamm and Handlin gave the orders while Bennett, Clapp, and Rogers took the greatest risks. Therefore, such evidence was properly admitted, apart from the reason stated in the April 8, 2002, Order [regarding defendant's motion in limine], because it showed the relationship of the co-conspirators and their intent in acting in concert.

(App. at 50-1.) We agree with and find no error in this well-reasoned finding.

*Use of Grand Jury Testimony at Trial*

Handlin testified before the grand jury. The government did not provide Handlin with *Miranda*-styled warnings or otherwise inform him that he was a target of the grand jury's investigation. The district court refused to allow the government to use that testimony in their case-in-chief

but did allow it for impeachment. When Handlin took the stand at his trial, he testified that he did not move any items out of Joe's Company Store shortly before the 1996 arson of that establishment and that Clapp was not present when the items were moved. His grand jury testimony directly contradicted this testimony and the government impeached him with his prior statements. Handlin claims this was error. It was not.

Assuming, without deciding, that there was a *Miranda* violation, suppression of evidence by reason of a *Miranda* violation is a shield, not a sword. *see Harris v. New York*, 401 U.S. 222 (1971). The Fifth Amendment privilege against self-incrimination does not give a defendant license to perjure himself. *Id.* at 225. "Having voluntarily taken that stand, [the defendant] was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." *Id.*

Handlin also argues that his grand jury testimony cannot be used for any purpose because it was "compelled" by the "broad coercive power" of the grand jury subpoena. In support of this argument, he cites to *New Jersey v. Portash*, 440 U.S. 450, 459 (1979). His reliance is misplaced. The defendant in *Portash* had received immunity and therefore, *his* testimony was compelled whereas Handlin's was not. Handlin makes no real argument that his testimony was coerced or otherwise involuntary. We find no error in the district court's ruling.

## CONCLUSION

In conclusion, we find no error in the district court's findings or rulings.

AFFIRMED.

No. 02-3589                                    15

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—5-3-04