In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 05-2532, 05-2571 & 05-2853

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

AUZIO HEWLETT,

*Defendant-Appellant,*
*Cross-Appellee,*

and

ALFRED GARY,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 03-CR-23—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED JUNE 8, 2006—DECIDED JULY 10, 2006

Before EASTERBROOK, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Auzio Hewlett and Alfred Gary were convicted, following a jury trial, of conspiracy to distribute and to possess with intent to distribute 50 grams or more of crack cocaine and 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, and

18 U.S.C. § 2. Hewlett was sentenced to 240 months imprisonment and Gary received a life sentence. Both have appealed their convictions and the government has cross-appealed, claiming that Hewlett's sentence is unreasonable—that is, unreasonably short.

Hewlett and Gary were in the drug business together from the mid-1990s until the spring of 2003, when they were arrested—in possession of several kilograms of cocaine and marijuana—in Missouri on their way back to Wisconsin from Texas.

Their drug operation was originally centered in Racine, Wisconsin, selling crack cocaine with a man named Deontrae Mayfield. For some time during 1996 or 1997, Hewlett was a student at the University of Wisconsin-Parkside, near Racine. His roommate at Parkside later stored large quantities of cocaine, marijuana, and money for Hewlett and Gary.

In 1997, Hewlett and Gary took Mayfield to Janesville, a one-hour drive west from Racine. Mayfield realized that the crack market was much better in Janesville than Racine: the profits were higher and the streets were safer because of the absence of gang activity. They expanded the operation to Janesville. In fact, Mayfield moved to Janesville in 1997 to continue sales. In Janesville, the three often used juvenile girls to conduct their business, surmising that the girls would face less severe punishment if caught. Rather than sharing the profits of the drug sales with the girls, Mayfield and Hewlett would buy things for them—clothing, food from McDonald's. This stingy treatment of their employees apparently didn't engender an abundance of loyalty to the Gary/Hewlett operation as some of the girls became government witnesses against them.

In 1999, Hewlett was arrested in Janesville when one of the girls, April Peterson, drove—in a borrowed car—to his motel to drop off money and pick up more crack. There were police in the parking lot, but she nevertheless went to

Hewlett's room. When she left with drugs, she apparently panicked at the presence of the police. She drove next door to a gas station, abandoned the car, called a friend to come and get her, and threw the drugs in a garbage can, all of which led to the arrests of Hewlett and others. Both before and after Hewlett's arrest, he and Gary continued to sell crack in Racine.

In 2003, Hewlett and Gary made two trips to Texas. Along on the second trip were Cassandra Maiden and Wythena Facen. On Interstate 44 south of St. Louis, Hewlett, who was driving, made a quick lane change that caused the SUV to veer onto the shoulder of the road. This maneuver caught the attention of a police officer in a marked squad car. As the squad approached their vehicle, Hewlett instructed Facen and Maiden to say they were traveling from Oklahoma. Facen was in the front passenger seat, Maiden was in the backseat, and Gary was lying in the cargo area of the SUV hiding under blankets. When the police reached the SUV, Hewlett presented a fraudulent Ohio driver's license. He acknowledged that the vehicle was a rental and, despite the fact that Gary was in the back under blankets, said the paperwork was in the cargo area. When the officers looked in the cargo area, they found Gary, who also produced a fraudulent Ohio driver's license. Because of these and other suspicious aspects to the stop, the officers brought in a narcotics-sniffing dog. Not surprisingly, Fido sniffed and indicated that drugs were present. The officers cut open an old, solid-sounding spare tire and found over three kilograms of cocaine and 17 packages of marijuana. That was the end of the Hewlett-Gary drug business.

In this appeal, Hewlett and Gary first argue that there was an impermissible variance between the single conspiracy charged in the indictment and the proof at trial. They contend that rather than one overarching conspiracy, there are actually three smaller conspiracies: a Janesville

conspiracy, a Racine conspiracy, and a Missouri "incident." We disagree, but even were we to agree, the claim would fail.

A claim of a fatal variance is treated as an attack on the sufficiency of the evidence. *United States v. Handlin*, 366 F.3d 584 (7th Cir. 2004). Even if the evidence at trial reveals the existence of multiple conspiracies, a variance is not fatal if a reasonable juror could have found beyond a reasonable doubt that the defendants were part of the single, charged conspiracy. *Id.* We view the evidence in the light most favorable to the government. *Id.* Furthermore, the defendants must show that the variance prejudiced them. *United States v. Messino*, 382 F.3d 704 (7th Cir. 2004).

It is clear that for years Hewlett and Gary were involved together in the sale of drugs. It is of no consequence that they sold their wares in two locations and drove drugs though a third. Neither of the men claims—or could claim—that he was merely a buyer in a buyer-seller relationship with the other. Furthermore, neither could claim that he was involved in one smaller conspiracy but not another small conspiracy. Each was involved in this business from beginning to end in Racine, Janesville, and, for that matter, in Missouri. The evidence here allowed a reasonable jury to find that Hewlett and Gary were part of a single conspiracy.

But above all, there is no way to show that either was prejudiced by being charged in one, rather than three conspiracies. Neither could claim, for instance, that while he might have sold drugs in Racine, he had nothing to do with the Janesville operation. They were both involved in all aspects of this business. Neither defendant could receive a lesser sentence if he were convicted of two or three smaller conspiracies, rather than the larger one. There simply is no prejudice.

Hewlett and Gary also contend that the district judge committed reversible error in how he responded to a question the jury asked during its deliberations. The question was, "Can we find one defendant guilty and one not guilty?" The judge proposed to answer the question by saying:

> Your instructions require that you consider each defendant's innocence or guilt separately. This answer is part of the written instructions that have been provided to you. Also keep in mind that you must follow all of the instructions that you have been given by the court.

Counsel for Gary objected to the word "innocence," pointing out that the duty of the jury is not to determine innocence, but rather a lack of guilt. Counsel suggested that a simple "yes" would be a sufficient answer to the question.

As if to illustrate the be-careful-what-you-wish-for principle, the judge responded:

> Yeah. It probably would be appropriate to just refer to "guilt," but I put "innocence" in there for your benefit, and since you don't want it it's out. . . . It's out. Enough said. . . . It's out.

He continued, "I will refer to guilt only." And "You said that's what you wanted, that's what you'll get." Later he said, "'Innocence' is equivalent to 'not guilty,' but you did not want 'innocence.'"

The answer which was given to the jury was:

> Your instructions require that you consider each defendant's guilt separately. This answer is part of the written instructions that have been provided to you. Also keep in mind that you must follow all of the instructions that you have been given by the court.

Very shortly, because he observed a typographical error in the instruction, the judge asked the bailiff to retrieve that

answer, and he listened to further argument regarding the response. The rewritten response, which was then sent to the jury, said:

> Your instructions require that you determine whether each defendant is guilty or not guilty. This should be done separately.

Defendants argue that all of this could well confuse the jury and constitutes reversible error.

We review a decision to answer a question from the jury as well as the language used in the response for an abuse of discretion. *United States v. Young*, 316 F.3d 649 (7th Cir. 2002). We examine a supplemental instruction by determining whether the instruction as a whole fairly and adequately treats the issue, whether the instruction is a correct statement of the law, and whether the court answered the question specifically. *Id.*

Was there a better way to handle this situation? The answer is yes—which, by the way—probably was, as well, the better answer to the jury's question. But we do not demand the best answer. Here, the instructions as a whole, which the jury was referred to and which they had in the jury room, were a correct statement of the law. The second answer to the jury's question was unassailable. As to the first answer, we are not convinced, in this context, that a reference to considering each defendant's guilt separately is reversible error. At the same time, for future reference, after our preference for a simple, "yes," we recommend the second answer, not the first.

Defendants also raise an issue, to preserve it, based on *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). We duly note that the issue has been properly raised.

We now arrive at the cross-appeal of the government, in which the contention is that the 20-year sentence imposed on Hewlett was unreasonable. Hewlett faced a statutory mandatory minimum sentence of 20 years and a maximum

of life. Applying the guidelines, his sentence would have been life. The judge, however, concluded that the statutory minimum was a sufficient sentence.

The government's objection to the sentence is that the sentence below the guideline range was unreasonable. *See United States v. Booker*, 543 U.S. 220 (2005). We disagree. First of all, the government did not recommend the maximum—a life sentence. It cited Hewlett's intelligence and potential to give back to the community and recommended a sentence of 30 years. The judge agreed that there was reason to cut Hewlett a break; he simply gave him a larger break than the government asked for—again, be careful what you ask for. The judge cited as reasons Hewlett's "redeeming qualities," his "family history," and his age. Saying that the mandatory minimum term of 20 years "exacts a very substantial measure of punishment" and "sends a chilling message to anyone interested in dealing drugs." It may be a close question, but we cannot find that the sentence imposed on Hewlett was unreasonable.

Accordingly, the judgments of the district court are AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring.  I join the court's opinion and offer a few additional observations about the cross-appeal.

The prosecutor's brief chides the district court for departing too many levels without an explanation linked to the structure of the Guidelines. *United States v. Booker*, 543 U.S. 220 (2005), rendered the departure apparatus and

terminology archaic. See *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005). A sentence within the Guideline range is presumptively reasonable, but other sentences may be reasonable too, and appellate review is deferential. Reasonableness is a range, not a point. See *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). The prosecutor recommended what would have been a 9-level downward departure in pre-*Booker* terminology; the district judge could determine, without abusing his discretion, that a further 4-level reduction was reasonable. But was it a *lawful* reduction?

The United States did not file an information under 21 U.S.C. §851 specifying all of Hewlett's prior convictions, which would have made a life sentence mandatory. (The prosecutor's brief concedes that this was an oversight rather than a deliberate choice.) Even after that gaffe the United States could have relied on the fact that Hewlett is a career offender—that's why his criminal history category is VI and the Guidelines call for life imprisonment, neither more nor less. Life also is the statutory maximum.

Congress has directed that career offenders be sentenced at or near the statutory maximum for a serious drug offense or crime of violence. 28 U.S.C. §994(h). Like other rules of law that prescribe appropriate sentences, this survives *Booker*. See *United States v. Woodard*, 408 F.3d 396 (7th Cir. 2005). It survives because Booker concerns who finds facts (and under what burden of persuasion) but not what consequences the law attaches to facts that have been authoritatively determined. (For other illustrations of *Booker*'s irrelevance to legal rules, see, e.g., *United States v. Miller*, No. 05-2978 (7th Cir. June 7, 2006) (ratio of crack to powder cocaine); *United States v. Duncan*, 413 F.3d 680, 683 (7th Cir. 2005) (recidivist sentences); *United States v. Rivera*, 411 F.3d 864, 866-67 (7th Cir. 2005) (mandatory minimum sentences); *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005); *McReynolds v. United States*, 397 F.3d

479, 481 (7th Cir. 2005).) Hewlett's current conviction is for a serious drug offense, so he should have been sentenced to life in prison or something "near" it.

A sentence of 20 years, the mandatory minimum, is not by any stretch of the imagination "at or near" life in prison. Yet the United States did not rely on §994(h) in the district court or mention it here. Likewise the United States has forfeited the benefit of *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006), which shows that the district judge erred by using concern about "sentence disparity" as justification for a below-Guideline prison term.

When the United States proposes a sentence well below the Guideline range it is poorly situated to complain when the district judge is slightly more lenient. Discounted to present value, the deterrent force of a 20-year sentence is only a little less than that of 30 years (for years 21 to 30 are so far in the future that they have little effect on today's behavior). The main difference between 20- and 30-year sentences lies in the longer term's power to protect the public by incapacitation. Yet when recommending 30 years, as opposed to life, the United States espoused the view that because Hewlett is intelligent he will abandon his criminal career. That strikes me as topsy-turvy—a high IQ makes a person more dangerous (if only because a clever criminal is less likely to be caught and convicted), and to date Hewlett has employed his talents as a criminal entrepreneur and predator. Criminal propensity falls with age, but even at 47 (which Hewlett will be after serving the district court's sentence, if he behaves himself in prison and receives the 15% discount) the mastermind of a criminal syndicate remains dangerous. Leaders of organized crime often stay at their posts well after becoming eligible for Social Security benefits. Still, if the prosecutor is right, incapacitation is unnecessary.

Where this 20-year sentence falls short is on general deterrence and desert, which underlie §851 and §994(h).

Perhaps that's why the Solicitor General authorized this appeal despite the prosecutor's optimistic estimate of Hewlett's likely conduct following his release. But arguments based on these statutes have been forfeited.

A true Copy:

    Teste:

           _____
           *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*