In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-4309

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MIGUEL BOLIVAR,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04-CR-925-5—**James B. Zagel**, *Judge*.

_____

ARGUED NOVEMBER 2, 2007—DECIDED JULY 8, 2008

_____

Before MANION, ROVNER, and EVANS, *Circuit Judges*.

ROVNER, *Circuit Judge*.   Miguel Bolivar was charged
along with his daughter and nephew with distributing
a small quantity of cocaine and also conspiring to sell a
larger amount. *See* 21 U.S.C. §§ 841(a)(1), 846. The daughter
and nephew pleaded guilty; she testified for the gov-
ernment and he, for the defense. The jury found Bolivar
guilty of both crimes. On appeal, he chiefly argues that
the government proved his involvement in a drug offense
different from the ones it charged. He also challenges
several evidentiary rulings. We affirm Bolivar's convic-
tions.

On October 13, 2004, informant William Gaddy met with Lupe Perez, Bolivar's nephew, and expressed his interest in buying cocaine from Perez. Gaddy recorded the conversation, as he did all of his conversations with the conspirators, over the next six days. The two men agreed that Perez would supply Gaddy with a sample of cocaine as a precursor to a larger transaction. During this meeting Perez received a call on his cell phone. Gaddy overheard the male caller promise Perez he would show Gaddy "what it is." Perez then handed the phone to Gaddy, who listened as the caller encouraged him to look at their cocaine. At the time Perez did not identify the caller by name, but he did say he was living at the caller's residence. Later that day Gaddy and Perez met again. Perez elaborated that he lived with his uncle, and he estimated that, between the two of them, they ought to have about 27 "keys" of cocaine in stock.

The next day Perez contacted Gaddy and said he was sending his cousin to deliver a sample of cocaine. A short time later Bolivar's daughter, Michelle Bolivar, delivered about two grams. She identified herself to Gaddy as Perez's cousin, and said that Perez's uncle was her father, Miguel Bolivar. Michelle, who revealed that she did not get along with her father, warned Gaddy not to tell Bolivar they had met because she feared that Bolivar would harm them both if he knew she was involved in a drug deal. Michelle mentioned that Perez had not invited her inside the location where she picked up the sample, which led her to believe that her father was at that location.

On October 15, Gaddy spoke to Perez by telephone and pressed him to proceed with the main delivery. Gaddy demanded to speak to Perez's uncle, and Perez gave him

Bolivar's telephone number. Gaddy called and arranged to meet Bolivar. Later that day surveillance agents watched the meeting and listened to the conversation as it was being broadcast (and recorded) by equipment concealed on Gaddy. Bolivar said he no longer had any of the cocaine he possessed when he discussed the deal with Perez a few days earlier. The last of the good stock, Bolivar explained, was the "picture" he had given to Perez to pass along to Gaddy. Bolivar added that he and Perez did have inferior cocaine that Gaddy could buy, but he said he would prefer to supply Gaddy with high-quality cocaine and asked him to be patient. When Gaddy replied that he did not want to wait, Bolivar reassured him that "we gonna deal," and told him that Perez was out talking to their suppliers.

Over the next several days, Gaddy continued negotiating by telephone with Perez, Michelle Bolivar, and one of Michelle's friends, Erika Musgraves. Perez and the two women promised to procure five kilograms of cocaine from one of their suppliers, "Claudia," and to deliver the drugs to Gaddy the night of October 19. On that evening Perez, Michelle, and Musgraves delivered one kilogram and were promptly arrested by surveillance agents. Musgraves led the agents to four more kilogram bricks concealed in Perez's van.

Bolivar was arrested at his residence in January 2005. The agents seized his cell phone and a digital scale covered with cocaine residue. After *Miranda* warnings, Bolivar told the agents he knew about large quantities of drugs coming from Mexico, but was hesitant to cooperate because the dealers were dangerous, particularly since rumors that Michelle was helping the DEA had circulated widely. Bolivar, however, never assisted the government.

Bolivar, Perez, Michelle, and Musgraves were charged with conspiring to possess and distribute cocaine beginning on October 13, 2004, and continuing until October 20. All but Musgraves also were charged with distributing the cocaine sample on October 14, 2004. Perez and Michelle both pleaded guilty to the conspiracy charge. Bolivar and Musgraves proceeded to trial together.

Before trial the government proffered its conspiracy evidence to support the conditional admission of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). The government did not intend to call Gaddy as a witness, so most of those statements would be introduced through the conversations he recorded. The government asserted that the recorded conversations evidenced Bolivar's participation in a conspiracy with Perez, Michelle, and Musgraves to sell drugs to Gaddy. Bolivar responded that *none* of the conversations should be admitted because, he insisted, the government's proffer did not evidence a conspiracy even under the preponderance standard applicable in making a threshold determination of admissibility. *See United States v. Stotts*, 323 F.3d 520, 521 (7th Cir. 2003). Bolivar also singled out the conversation on October 13, 2004, among Perez, Gaddy, and the male caller whom Perez did not identify by name. That conversation could not be admitted, Bolivar insisted, because the government could not identify the voice of the person who called Perez's cell phone and spoke to Gaddy. Bolivar added that the "uncle" Perez referred to in his second conversation with Gaddy on October 13 could be anyone, and he emphasized that it was Claudia who supplied the kilograms of cocaine that Perez, Michelle, and Musgraves set out to deliver to Gaddy on October 19. The government assured the court that

the transcript it would give to the jury for the first October 13 conversation would identify the caller only as an "unidentified male." The district court ruled that the government's proffer was sufficient to support the conditional admission of the recorded coconspirator statements.

The government also introduced Bolivar's post-arrest representation that he could provide the agents with information about large amounts of drugs coming from Mexico. Bolivar objected that his statement was not relevant to the charged conspiracy and thus constituted "bad acts" evidence that should be excluded under Federal Rule of Evidence 404(b). But the district court agreed with the government that Bolivar's statement corroborated the connections to the drug trade he mentioned in talking to Gaddy. Therefore, the court reasoned, the statement was not extraneous.

After the government presented all of the recorded conversations between Bolivar, Gaddy, Perez, Michelle, and Musgraves, as well as Bolivar's post-arrest statement, Michelle testified for the government. On direct examination she confirmed that she had delivered the cocaine sample from Perez to Gaddy on October 14, and she reiterated her recorded representation to Gaddy during that delivery that she believed her father had been present at the location where she picked up the sample from Perez because he met her outside instead of inviting her in. She also testified that on the evening of October 19 she, Perez, and Musgraves had met with a drug dealer named Claudia and a friend of Claudia's named Ismael to obtain the drugs. On cross-examination, though, Michelle displayed less certainty about her belief that Bolivar was present when she obtained the sample from

Perez. She conceded that on the day she delivered the sample she had visited Perez at the house two or three times and had been invited inside at least once. She could no longer remember, she said, whether she actually obtained the drug sample during a visit in which Perez invited her inside.

Perez, despite his guilty plea to the conspiracy, testified for the defense and denied that Bolivar had been involved in the charged crimes. Perez said he had copied a key to Bolivar's house and stayed there when Bolivar was away, but he also lived at other locations. The scale found at this house was his, he said, and Bolivar was unaware it was there. Perez explained that his frequent references to his "uncle" were not references to Bolivar. He insisted that he called several drug dealers "uncle" out of respect, including one of Claudia's friends. Bolivar, he continued, was not present when Michelle came to pick up the sample she delivered to Gaddy.

Bolivar was found guilty on both counts, and sentenced to a total of 240 months' imprisonment. Musgraves was acquitted. The basic premise underlying most of Bolivar's arguments on appeal is that he was charged with conspiring with Perez, Michelle, and Musgraves to distribute five kilograms of cocaine to Gaddy on October 19 but the government instead proved only that he and Gaddy were involved in a "different" transaction. In Bolivar's opinion, the government proved only that he is a relative of Perez and Michelle, and that both he and Perez sold drugs. It follows, says Bolivar, that the government may have proved him guilty of something but not of the charged crimes.

Bolivar timely moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and we review

the district court's denial of that motion de novo. *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003). Bolivar's sufficiency claim fails if we conclude, after reviewing the evidence in the light most favorable to the government, that a rational jury could have found him guilty of the charged crimes beyond a reasonable doubt. *See United States v. Jenkins*, 419 F.3d 614, 617 (7th Cir. 2005); *Fassnacht*, 332 F.3d at 447. To prove Bolivar guilty on the conspiracy count, the government had to show that he embraced a common objective to sell drugs to Gaddy with another member of the conspiracy; the government was not required to establish that Bolivar participated in every aspect of the scheme, or that he knew all of the members. *See United States v. Womack,* 496 F.3d 791, 795 (7th Cir. 2007); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The essence of a drug conspiracy is the agreement itself. *United States v. Shabani,* 513 U.S. 10, 16 (1994); *United States v. Thomas*, 284 F.3d 746, 751 (7th Cir. 2002). As for the charge of possession with intent to distribute, the government had the burden to prove that Bolivar had the "authority to possess and determine the disposition" of what he knew to be a controlled substance. *See United States v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006).

The evidence is compelling. The audio recording of the face-to-face meeting between Bolivar and Gaddy on October 15 provided all of the evidence necessary to confirm Bolivar's participation in both the conspiracy and the substantive distribution. During that meeting Bolivar stated unequivocally that he was the source of the two-gram sample delivered to Gaddy the day before, and he emphatically assured Gaddy that the two of them were "gonna deal." Bolivar said he was momentarily out

of the high-grade cocaine represented by the sample, but he promised that Perez was going to find more. Thus, Bolivar's own words prove that he was working with Perez and the others to distribute cocaine, and whether the larger quantity delivered on October 19 passed through his hands enroute from one of their suppliers to Gaddy is wholly irrelevant. The relevant inquiry is whether Bolivar embraced the common scheme to distribute cocaine with Perez and the others, not whether he owned or was the original source of the drugs they distributed. *See Shabani,* 513 U.S. at 16; *Thomas,* 284 F.3d at 751.

Our resolution of the sufficiency claim also resolves two others. Bolivar contends that there was a fatal variance between the crimes charged and the crime that the government proved at trial. But we treat a claim of fatal variance the same as an attack on the sufficiency of the evidence, *United States v. Hewlett,* 453 F.3d 876, 879 (7th Cir. 2006); *United States v. Handlin,* 366 F.3d 584, 589 (7th Cir. 2004), and, as we explained above, the jury had ample evidence to convict Bolivar on both counts. Bolivar further insists that there was a constructive amendment of the indictment, but, as far as we can tell, his argument rehashes his view that the evidence was not sufficient to convict him of the charged conspiracy. We need not address the same claim under a different label.

Bolivar further argues that the district court erroneously admitted the October 13 recording that captured the voice of the male caller whom Perez did not identify; according to Bolivar, that recording should have been excluded because the government declined to identify the male caller as Bolivar. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Emerson,* 501 F.3d 804, 813 (7th Cir. 2007). If a preponder-

ance of the evidence supports the conclusion that the declarant uttered a statement in furtherance of a conspiracy in which the defendant participated, the statement is admissible. *United States v. Irorere*, 228 F.3d 816, 824 n.2 (7th Cir. 2000); *United States v. Johnson*, 200 F.3d 529, 532-33 (7th Cir. 2000).

Nothing prohibited the government from introducing the recording simply because the male caller's identity could not be positively confirmed from the recording alone. The recording was admissible because the caller's statements made evident that he was working with Perez to advance a common goal of selling cocaine to Gaddy; in other words, he was a coconspirator. *See United States v. Gajo*, 290 F.3d 922, 928 (7th Cir. 2002). Moreover, there was ample evidence from which a rational jury could conclude that, indeed, Bolivar was the male caller. Perez, who is Bolivar's nephew, told Gaddy that he lived with the male caller; he later told Gaddy that he lived with his uncle; and when Gaddy asked for the uncle's telephone number, Perez gave him Bolivar's. All of these representations were contemporaneously recorded, and at trial Perez even admitted that he sometimes stayed at Bolivar's residence. Unsurprisingly, as a defense witness Perez testified that Bolivar was unaware that he stayed at Bolivar's house, and he denied that he meant Bolivar when he frequently referred to his "uncle" while dealing with Gaddy. But the jury was under no obligation to believe this improbable testimony, and though Bolivar suggests that the government violated a promise not to imply that the unidentified caller was Bolivar, we see no evidence of such a promise. Nor do we understand Bolivar's contention that the government should have been foreclosed from asking the jury to draw an

entirely reasonable conclusion from the evidence presented; that the quality of the recording was low does not mean that the jury could not infer from the entirety of the evidence that Bolivar was the caller who wanted Gaddy to see his cocaine.

Bolivar next argues that the district court, in evaluating whether to admit various statements under the coconspirator exception, *see* FED. R. EVID. 801(d)(2)(E), delegated to the jury its own responsibility for making a threshold determination of conspiracy. We agree with Bolivar that the trial judge is responsible for deciding by a preponderance whether proffered coconspirator statements are admissible, whereas the jury's role is to determine whether the accused is guilty of the charged crimes. *See* FED. R. EVID. 104(a); *Stotts*, 323 F.3d at 521. But despite Bolivar's suggestion to the contrary, that is exactly what happened in this case. The district court could have—as Bolivar seems to think the court did—admitted the proffered coconspirator statements without demanding pretrial disclosure of the government's intended evidence; that is one acceptable option as long as the statements are admitted conditionally subject to the government eventually establishing the underlying conspiracy by a preponderance. *See United States v. Hunt*, 272 F.3d 488, 494 (7th Cir. 2001); *United States v. McClellan*, 165 F.3d 535, 553-54 (7th Cir. 1999). Yet here the court conducted a pretrial hearing specifically to determine whether the government would be able to establish a foundation for admission of the proffered coconspirator statements. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). The court concluded at that hearing that the government had a foundation for admitting the statements, and Bolivar's contention that the court abdicated that

decision to the jury is plainly contradicted by the record. In any event, our conclusion that the evidence admitted was sufficient to convict Bolivar on the conspiracy count beyond a reasonable doubt necessarily vindicates the district court's conclusion that the government had satisfied the more lenient standard for admission.

Finally, Bolivar argues that the district court erroneously admitted his post-arrest statement to police because, he insists, that statement about his knowledge of drugs arriving from Mexico only served to prove his propensity to commit bad acts. *See* FED. R. EVID. 404(b). But the district court did not abuse its discretion because Bolivar's confession was evidence of the charged crimes, not some other "bad acts." *See United States v. Senffner*, 280 F.3d 755, 764 (7th Cir. 2002); *United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). Bolivar had told an arresting officer that he knew about large amounts of drugs coming from Mexico, but he added that he was hesitant to cooperate because rumors of Michelle's cooperation with the DEA had circulated widely and the drug-dealers with whom he associated might endanger his family. Bolivar's statement was an admission of his deep involvement in the drug trade, and his reference to drugs arriving from Mexico corroborated the impression he gave Gaddy during their October 15 conversation about his access to cocaine from multiple sources. The jury knew from that conversation that Bolivar and Perez were getting cocaine from other suppliers, so Bolivar's attempt to distance his confession as a reference to other, unrelated crimes is without merit.

We therefore AFFIRM Bolivar's convictions.